**34 So.2d 746**

**OHIO OIL CO. v. FERGUSON et al.**

No. 37548.

Feb. 11, 1946.

On Rehearing Dec. 15, 1947.

Cook, Clark & Egan, Byron A. Irwin, C. J. Bolin, Foster, Hall & Smith, D. H. Perkins, Tucker, Bronson & Martin, Pyburn & Pyburn and Hussey & Smith, all of Shreveport, and McBride & Goff, of Ruston, for appellants.

R. L. Benoit, J. P. D'Artois and O. L. Hasty, all of Shreveport, for plaintiff-appellee Ohio Oil Co.

Herold, Cousin & Herold, of Shreveport, Liskow, Lewis, Gerard & Shepard, Thompson, Lewes & Cavanaugh, and McCoy & King, all of Lake Charles, Jerome A. Broussard, of St. Martinsville, and Wm. P. Hardeman, of Lake Charles, amici curiæ.

O'NIELL, Chief Justice.

This is concursus proceeding for the apportionment among several claimants of the proceeds of a one-eighth royalty interest in certain oil produced by the Ohio Oil Company as lessee of a tract of land in Claiborne Parish. Several of the parties to the proceeding have appealed from the judgment apportioning the fund among the claimants. Each appellant of course is complaining only of the part of the judgment that is adverse to his interest.

One of the appellants is the Toklan Royalty Corporation, whose one-fourth mineral interest in a 40-acre tract was held to have been extinguished by the prescription of 10 years liberandi causa. Mrs. Fannie W. Bond owns that 40-acre tract, described as the SE¼ of NE¼ of section .21 in T. 23 N., R. 8 W.; and as she owned it at the time of the expiration of the 10 years, the alleged prescription of the mineral interest of the Toklan Royalty Corporation was held to have inured to her benefit. She may be considered therefore as the appellee so far as the appeal of the Toklan Royalty Corporation is concerned.

The facts concerning that appeal are not disputed. On July 5, 1921, R. P. Bond, the ancestor in title of Mrs. Fannie W. Bond, sold to one S. C. Clark a one-fourth in-

terest in the minerals in a tract of land containing 240 acres and described as S½ of NE¼, W½ of SE¼, and E½ of SW¼ of Section 21 in T. 23 N., R. 8 W. The 240-acre tract therefore consists of six contiguous 40-acre subdivisions. As R. P. Bond was the owner of the entire 240 acres of land his sale of the one-fourth interest in the minerals to Clark created a mineral servitude on the whole tract. On July 19, 1921, Clark sold to I. R. Bordages the one-fourth mineral interest in the SE¼ of NE¼ of Section 21, retaining the one-fourth mineral interest in the remaining 200 acres. The Toklan Royalty Corporation acquired the one-fourth mineral interest in the SE¼ of NE¼ of Section 21 by mesne conveyances from I. R. Bordages. Drilling operations were had on that 40-acre tract and oil was produced therefrom until January 1929. The last well on that 40 acres was abandoned in March 1929. Drilling operations were continued however on the remaining 200 acres in which Clark had reserved the one-fourth mineral interest and oil was produced therefrom continously, so that it is not disputed that the mineral servitude which was created by the sale of the one-fourth mineral interest by Bond to Clark on July 5, 1921, was not extinguished by the prescription of 10 years so far as the servitude affected the 200 acres in which Clark retained his one-fourth mineral interest. The Toklan Royalty Corporation contends that the drilling operations and production that were had on the 200 acres in which Clark retained his one-fourth mineral interest prevented or suspended the prescription of the servitude not only on the 200 acres but also on the 40 acres on which the Toklan Royalty Corporation acquired the mineral servitude. The judge decided that the drilling operations and production of oil on the 200 acres in which Clark retained his one-fourth mineral interest did not prevent the running of prescription against the servitude on the 40 acres in which he sold his one-fourth mineral interest to Bordages, and in which the Toklan Royalty Corporation afterwards acquired the one-fourth mineral interest.

The judgment declaring that the mineral servitude which Clark sold to Bordages on July 19, 1921, and which was acquired afterwards by the Toklan Royalty Corporation, was extinguished by the prescription of 10 years is supported by the provisions of the second paragraph of article 803 of the Civil Code. The first paragraph of that article deals with predial servitudes, or real servitudes, that is to say, with servitudes due to an estate, or a tract of land, as distinguished from personal servitudes, or those which are due to persons. The first paragraph provides that if an estate to which a servitude is due and which is owned by two or more coproprietors, becomes divided by means of a partition, a proprietor who continues to use the servitude preserves his right to it, but those who do not continue to use it during the period required for prescription lose

the right by prescription. The second paragraph of article 803 deals, specifically, with personal servitudes, or those which are due to persons. This paragraph declares: "If a servitude be due to several persons, but on different days, as the right of drawing water, he who does not exercise his right, loses it, and the estate subject to to the servitude becomes free from it, as respects him."

■■ There is no difference, in the applicable principles of law, between a servitude which gives to two or more persons the right to draw water from the land of another and a servitude which gives to two or more persons the right to take the mineral oil or gas from the land of another. Nor is there any difference, in the applicable principles of law, between the dividing of the advantage of such a servitude by stipulating on what days each of the persons to whom the servitude is due may exercise his right, and dividing the advantage by stipulating the part of the land on which each of the persons to whom the servitude is due may exercise his right. Hence we may substitute, the words "mineral oil or gas" for the word "water", and substitute the words "different parts of the land" for the words "different days", and thus paraphrase the second paragraph of article 803 of the Civil Code, by saying that if a mineral servitude be due to two or more persons, but on different parts of the land that is subject to the servitude, he who does not exercise his right to explore

for the oil, gas or other minerals in that part of the land on which he has the right loses it for nonuse for the period of 10 years, and the land subject to the servitude becomes free from it as respects him.

The argument of the Toklan Royalty Corporation is founded upon the doctrine of indivisibility of servitudes, and, specifically, upon article 656 of the Civil Code, which declares that the rights of servitude, considered in themselves, are not susceptible of division, either real or imaginary, because it is impossible that an estate should have upon another estate a part of a right of way, or of view, or any other right of servitude, and also that an estate be charged with part of a servitude. The provisions of this article are modified by the statement in the second paragraph thereof that the use of a right of servitude may be limited to certain days or hours. The doctrine of indivisibility of the so-called right of servitude is modified also by the provisions of article 657 of the Civil Code, where it is declared that although the right of servitude be indivisible, and must be established for the whole, and not for a part of it, nothing prevents the advantage resulting from it from being divided, if it be susceptible of division.

The decision in Spears v. Nesbitt et al., 197 La. 931, 2 So.2d 650, is a precedent for the instant case. In the case cited the owner of a tract of land containing 120 acres and consisting of three 40-acre tracts

in a horizontal row, being the N½ of the NW¼ and the NW¼ of the NE¼ of a certain regular section, transferred a half interest in the oil, gas and other minerals in the land to one G. L. Shields, from whom the Trinity Royalty Company, one of the defendants in the suit, acquired title. Eight years afterwards on August 25, 1933 all of the landowners, and the owners of all of the mineral interests in each half of the whole section, including the Trinity Royalty Company, entered into two contracts of lease with one F. F. Meadows, one contract covering all of the W½ of the section and the other contract covering all of the E½ of the section. Of the 120-acre tract in which the Trinity Royalty Company owned the one-half mineral interest, two-thirds of the area, being the N½ of the NW¼ of the section, was of course covered by the lease on the west half of the section, and one-third of the area, being the NW¼ of the NE¼ of the section, was covered by the lease on the E½ of the section. Each one of the contracts of lease contained a stipulation that all of the parties pooled their mineral interests for the purpose of developing the half-section as a unit, and were to receive royalties from any oil or gas produced from any part of the half-section covered by the lease, in the proportion which their respective mineral rights bore to the mineral rights in all of that half-section, and that drilling operations conducted on any part of the half-section should be considered as being conducted on all parts of that half-section. In fact it was stipulated that the lessee would not have entered into the contract if it did not include the so-called pooling agreement on the part of all parties owning mineral interests in the half-section. Within the five years primary term of the lease certain oil companies, having acquired the leases from Meadows, drilled a producing gas well on the west half of the section, but not on the N½ of the NW¼, on which the Trinity Royalty Company owned the mineral servitude. There was no drilling done under the lease covering the E½ of the section. That lease was kept in force by the payment of the delay rentals until it terminated by expiration of the primary term of the lease. On March 23, 1940, the landowner sued to cancel the mineral servitude of the Trinity Royalty Company on the ground that it was extinguished by the prescription of 10 years, not only so far as it affected the 40 acres in the E½ of the section, being the NW¼ of the NE¼ thereof, but also so far as it affected the 80 acres in the W½ of the section, being the N½ of the NW¼ thereof. The court held that the drilling operations on the W½ of the section, by the provisions of the contract of lease, interrupted the 10 years prescription and thereby prevented the loss of the Trinity Royalty Company's servitude on the 80 acres in the W½ of the section, notwithstanding the drilling operations on that half of the section were not conducted on any part of the 80 acres in which the Trinity Royalty Company owned the one-

half mineral interest, or mineral servitude. That ruling was supported by the decision in a companion case, Robinson v. Horton, 197 La. 919, 2 So.2d 647, and by the decision in Dobbins v. Hodges, 208 La. 143, 23 So.2d 26, and by the decision in Jackson v. Hunt Oil Company, No. 37, 588, 208 La. 156, 23 So.2d 31.

But the court held, in Spears v. Nesbitt, that the drilling operations that were conducted under the lease covering the W½ of the section did not interrupt the prescription of 10 years which was running against the mineral servitude of the Trinity Royalty Company on the 40 acres in the E½ of the section, being the NW¼ of the NE¼ of the section, and hence that the mineral servitude of the Trinity Royalty Company on that 40-acre tract was lost by the prescription of 10 years for nonuse. In making this decision, with regard to the 40 acres in the E½ of the section, the court stated [197 La. 931.2 So.2d 654]:

"When the land owner (plaintiff's ancestor in title) and the defendant [Trinity Royalty Company] executed the two leases of August 25, 1933, dividing the acreage affected by the Trinity Company's servitude, they clearly indicated they did not intend to have the operations on either lease-block [on either half of the section] affect the rights of the land owner or the mineral owners under the other [lease block or half-section]. They in effect divided the company's [Trinity Royalty Company's] servitude into that acreage lo-

cated in the western half and that located in the eastern half [of the section]."

■ It might be argued that the statement that the landowner and the Trinity Royalty Company, in effect, divided the company's servitude into the acreage located in the western half and that located in the eastern half of the section is not consistent with article 656 of the Civil Code, which declares that the rights of servitude, considered in themselves, are not susceptible of division, either real or imaginary. But, in the next article, 657, of the Civil Code, it is declared that although the right of servitude be indivisible, and must be established for the whole, not for a part, nothing prevents the advantage which results from the servitude from being divided, if it be susceptible of division. The statement, therefore, in the opinion in Spears v. Nesbitt, that the landowner and the owner of the mineral servitude, divided the servitude, means, obviously, according to articles 656 and 657 of the Civil Code, that the landowner and the owner of the servitude divided "the advantage resulting from" the servitude. There could be no objection, however, to the statement that the landowner and the owner of the servitude divided the servitude, by dividing the acreage on which it was imposed into that part located in the western half and that part located in the eastern half of the section. We say this because the only parties concerned in the matter of dividing the servitude, or the advantage of the

servitude, were the landowner and the owner of the servitude, and certainly there is nothing so sacramental in the doctrine of indivisibility of servitudes as to prevent the division of a servitude "if it be susceptible of division" by agreement of all parties concerned. In the instant case the landowner was not a party to the sale made by Clark to Bordages on July 19, 1921, by which the mineral servitude, or "the advantage resulting from it", on the 240 acres of land, was divided between Clark and Bordages, by Clark's selling to Bordages his one-fourth mineral rights in a designated 40 acres of the land, and retaining his one-fourth mineral rights in the remaining 200 acres. But the fact that the landowner was not a party to that transaction does not distinguish the instant case from that of Spears v. Nesbitt, because the landowner in the instant case accepted the advantage of the division in response to this suit. In fact the division of the advantage of the servitude was a matter to which the landowner had no interest in objecting, because it was essentially advantageous to the landowner, in that it required each one of the owners of the servitude thereafter to develop that part of the land on which he acquired or retained the servitude, in order to prevent its being lost by the prescription of 10 years.

Another difference between the facts of the instant case and the facts in Spears v. Nesbitt is that in the instant case the drilling operations were continued on the 200 acres which formed a part of the original 240 acres, and on which Clark retained the mineral servitude; whereas, in Spears v. Nesbitt the drilling operations were not conducted on any part of the 120 acres on which the mineral servitude was imposed originally but were conducted on another part of the half-section in which 80 acres of the tract originally burdened with the servitude were located. That difference in the facts of the two cases does not distinguish them in principle, because in Spears v. Nesbitt the drilling operations were conducted on the half-section covered by the lease containing the stipulation that drilling on any part of the half-section should be considered as drilling on any and all other parts of that half-section, and because a part of the land burdened with the servitude was located in that half-section. According to the decisions which we have cited the drilling operations which were conducted on the W½ of the section, though not on the N½ of the NW¼ thereof, had the same effect as if the drilling operations had been conducted on the N½ of the NW¼ of the section. Robinson v. Horton, 197 La. 919, 2 So.2d 647; Dobbins v. Hodges, 208 La. 143, 23 So.2d 26; Jackson v. Hunt Oil Co., No. 37, 588, 208 La. 156, 23 So.2d 31.

■ The Toklan Royalty Corporation relies upon the doctrine, which is well recognized in our jurisprudence, that, where a mineral servitude is created upon a single tract of land by the sale of the mineral

rights by the owner of the land, or by his selling the land and reserving the mineral rights, only one servitude is established on the whole tract, and drilling operations conducted upon any part of the land upon which the servitude is established will prevent the extinguishment of the servitude by prescription on any and all parts of the land subject to the servitude. The cases cited by the Toklan Royalty Corporation are Lee v. Giauque, 154 La. 491, 97 So. 669; Sample v. Whitaker, 172 La. 722, 135 So. 38; Patton v. Frost Lumber Industries, Inc., 176 La. 916, 147 So. 33; Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; Ohio Oil Co. v. Cox, 196 La. 193, 198 So. 902; Hodges v. Norton, 200 La. 614, 8 So.2d 618.

The facts in the cases cited are not like the instant case where the advantage of the servitude was divided, as it was by the sale by Clark of his mineral rights so far as they affected a part of the land on which the servitude was established.

▮ For example, the case of Lee v. Giauque, 154 La. 491, 97 So. 669, is authority merely for the proposition that where the mineral rights are reserved on two or more separate tracts of land the effect is to establish as many servitudes as there are tracts of land, and the exercise of the right upon one of the tracts will prevent the right from being extinguished by prescription on that tract, but not on any noncontiguous tract of land.

Sample v. Whitaker is the first case in which the court held that a servitude, such as the right to explore for and reduce to possession the oil and gas or other minerals in the land of another, is indivisible, according to article 656 of the Civil Code, and hence that, if the prescription of 10 years by which servitudes are extinguished is suspended as to one of two or more co-owners of such a servitude, it is necessarily suspended as to all of the co-owners of the servitude. We have discussed and disposed of the subject of indivisibility of servitudes, as provided for in article 656, and the divisibility of the advantage of the right of servitude, as provided for in article 657. It was in Sample v. Whitaker that the court construed the word "coproprietors" as meaning not the coproprietors of the estate to which a predial servitude is due, but the coproprietors of the servitude itself, and hence construed article 802 as being applicable to a mineral servitude. So far as the decision in Sample v. Whitaker was applicable to a mineral servitude its effect has been destroyed by Act No. 232 of 1944. The doctrine of the case is not applicable to the instant case. In this case the question is whether a personal servitude, or "the advantage resulting from it", may be divided, with the consent or approval of all persons having any interest in the matter, "if it be susceptible of division". We have pointed out already that in this case the landowner, who was benefited, necessarily, by dividing of the

advantage resulting from the servitude, accepted the advantage.

█ The decision in the case of Patton v. Frost Lumber Industries, 176 La. 916, 147 So. 33, was that the owner of a mineral servitude could not be affected adversely, so far as the liberative prescription was concerned, by the sale by the landowner of numerous small parts of the land burdened with the servitude. The doctrine of that case is simply that the owner of a tract of land burdened with a mineral servitude cannot do anything to lessen the value of the servitude to its owner without his consent.

█ Connell v. Muslow Oil Company, 186 La. 491, 172 So. 763, is authority for the proposition only that, where the owners of the mineral rights in a tract of land were in possession of their mineral servitude by operating a producing oil well on a part of the land, a purchaser of the other part of the tract of land could not, by means of his possession of the surface of his part of the land for more than 10 years, acquire title by the prescription acquirendi causa to the mineral rights in the part of the land purchased and possessed by him. That decision has no application to the instant case.

In the case of Ohio Oil Co. v. Cox, 196 La. 193, 194, 198 So. 902, the court merely repeated the holding in Sample v. Whitaker, that article 802 of the Civil Code was applicable to a personal servitude, and hence to a mineral servitude, and that

where one of several co-owners of such a servitude on one and the same tract of land was a minor, against whom prescription could not run, the prescription was suspended as to all of the co-owners of the servitude.

In the case of Hodges v. Norton, 200 La. 614, 8 So.2d 618, the owners of a tract of land containing 440 acres, namely, Edmond W. Hodges and his wife, Augusta Ann Hodges, sold the land to Andrew J. Hodges, reserving to themselves one-half interest in the oil, gas and other minerals in and under the land. Thereafter Edmond W. Hodges died and was survived by his widow Augusta Ann Hodges, and their 10 children. The mineral interests in the land were then owned one-half by Andrew J. Hodges and the other one-half by Mrs. Augusta Ann Hodges and her 10 children; and the land itself was owned by Andrew J. Hodges. He and Mrs. Augusta Ann Hodges and her 10 children leased the 440 acres of land to R. D. Webb for the production of oil, gas and other minerals. Thereafter Mrs. Augusta Ann Hodges and her 10 children sold to J. A. Selby, Jr., an undivided one-fourth of the mineral interest in the 440 acres of land. Two days later Selby sold to R. W. Norton, from whom the defendants in the suit acquired title, the one-fourth interest in the minerals in 220 acres of the 440 acres and Selby retained his one-fourth mineral interest in the remaining 220 acres. Thereafter several

producing wells were drilled under the lease which Mrs. Augusta Ann Hodges and her 10 children and Andrew J. Hodges had granted to R. D. Webb. These wells were drilled not on any part of the 220 acres in which Selby sold the mineral rights to Norton but on the remaining 220 acres in which Selby retained the one-fourth mineral interest, in which Mrs. Augusta Ann Hodges and her 10 children owned also the one-fourth mineral interest, and in which Andrew J. Hodges owned the one-half mineral interest. More than ten years having gone by, and Norton having died, A. J. Hodges, the landowner, sued the widow and daughter of Norton, to declare that the servitude was extinguished by prescription, so far as it affected 140 acres included in the 220 acres in which Selby had sold to Norton the one-fourth mineral interest. The defendants, widow and daughter of R. W. Norton, pleaded successfully that the prescription was suspended with respect to the one-fourth mineral interest of Norton in the 220 acres of land, by the drilling operations conducted on the 220 acres in which Selby had retained his one-fourth mineral interest. The decision is reconcilable with the judgment rendered in the instant case against the Toklan Royalty Corporation, by the fact that in Hodges v. Norton, Mrs. Augusta Ann Hodges and her 10 children, who were co-lessors with the landowner, Andrew J. Hodges, in the lease under which the drilling operations were conducted, retained a one-fourth mineral interest in the whole 440 acres conveyed by the original mineral servitude. In the instant case there was no such joint ownership of the mineral rights by Clark and the Toklan Royalty Corporation.

Counsel for Mrs. Fannie W. Bond rely upon article 798 of the Civil Code, which provides that, if the owner of a servitude has enjoyed a right less extensive than that which is given him by his title, the servitude, whatever be its nature, is reduced to that which is preserved by use or possession during the time necessary to establish prescription. That article, of course, is not to be construed so as to conflict with the rule, which is established by the jurisprudence, that where the owner of a mineral servitude on a single tract of land exercises his right by drilling on any part of the land he suspends prescription of the servitude as to all of the tract. But, when, as in this case, the owner of such a servitude disavows his intention or abandons his right to drill upon a specified part of the tract on which he owns the mineral servitude, article 798 is applicable. In such a case, the article is in harmony with the second paragraph of article 803 of the Civil Code.

Our conclusion is that the judgment appealed from, so far as it declares that the mineral interest of the Toklan Royalty Corporation in the 40 acres forming the SE¼ of NE¼ of Section 21, T. 23 N., R. 8 W., has been extinguished by the prescription of 10 years, is correct.

Two other parties to this proceeding, namely, L. E. and G. A. Davis, are appealing from the judgment declaring that their mineral servitude on the SE¼ of NE¼ of Section 21 was lost by the prescription of 10 years liberandi causa. Mrs. Fannie W. Bond was the owner of this 40-acre tract at the time when the 10 years expired and therefore got the benefit of the prescription. The servitude, consisting of a one-half mineral interest in the 40 acres, was sold by R. P. Bond to L. E. and G. A. Davis for $3,000, on April 2, 1921, when R. P. Bond owned the 40 acres. The last well on the tract was abandoned on March 7, 1929. Hence it is conceded that the servitude was lost by L. E. and G. A. Davis unless the prescription was suspended. They contend that the prescription was suspended when J. L. Bond, the husband of Fannie W. Bond, signed the pooled lease in favor of the Ohio Oil Company on April 5, 1937. At that time the SE¼ of the NE¼ of Section 21 stood of record in the name of Mrs. Fannie W. Bond, wife of J. L. Bond. L. E. and G. A. Davis claim that, notwithstanding the title to the land stood in the name of Mrs. Fannie W. Bond, the land actually belonged to the matrimonial community existing between her and J. L. Bond, and hence that his signing the pooling agreement had the same effect as if the title stood in his name. It appears that J. L. Bond sold the land to his father, R. P. Bond, on May 1, 1933, and that the latter sold the land to Mrs. Fannie W. Bond on September 1, 1933. L. E. and G. A. Davis contend that these sales were simulations. The court received evidence extensively, both documentary and oral evidence, on the question of simulation, and concluded that the sales were genuine. There is no good reason for taking issue with the judge on that conclusion of fact; the° consequence of which is that the land became the separate property of Mrs. Fannie W. Bond by virtue of the sale made by her husband to his father and the sale made by the latter to Mrs. Fannie W. Bond. But the judge rested his opinion also upon article 2334 of the Civil Code, which, as amended by Act No. 170 of 1912 and Act No. 186 of 1920, provides that when title to community property stands of record in the name of the wife it cannot be mortgaged or sold by the husband without the written authority or consent of the wife. That article as amended has been construed to mean that the husband cannot alienate or otherwise encumber the property by any transaction without the authority or consent of his wife. Bywater v. Enderle, 175 La. 1098, 145 So. 118. We adhere to that interpretation of the statute and hence affirm the judgment that J. L. Bond could not, by signing the pooled lease in favor of the Ohio Oil Company on April 5, 1937, without his wife's authority or consent, extend the term of prescription, and thereby increase the burden of the servitude of L. E. and G. A. Davis on the land of Mrs. Fannie W. Bond.

What we have said in disposing of the mineral servitude which L. E. and G. A. Davis had on the SE¼ of NE¼ of Section 21 ·is applicable also to an appeal taken by two other parties to this proceeding, namely, C. E. Miller and Claud Beene, whose mineral servitude on the 20 acres described as S½ of NW¼ of NE¼ of Section 21 was adjudged extinguished by prescription. Miller and Beene acquired a one-fourth mineral interest in this 20-acre tract on July 9, 1921, from J. L. Bond, who was then the owner of the 20 acres of land. Miller and Beene urged the same defenses to the plea of prescription that were urged by L. E. and G. A. Davis. These defenses are not available to Miller and Beene any more than to L. E. and G. A. Davis. Miller and Beene urge a further defense to the plea of prescription that on April 15, 1942, Mrs. Fannie W. Bond and her husband J. L. Bond signed a pooling and unitization contract which recited that the Ohio Oil Company was the owner of the various leases affecting the W½ of the NE¼ of Section 21, which contracts of lease were made a part of the pooling and unitization contract and incorporated therein by reference. It is contended by Miller and Beene that the signing of this pooling and unitization contract by Mrs. Fannie W. Bond and her husband, J. L. Bond, on April 15, 1942, was a ratification by her of the lease contract which had ·been signed by her husband on April 5, 1937. The answer to that contention is that on April 5, 1942,

when Mrs. Fannie W. Bond and her husband signed the pooling and unitization agreement, the mineral servitude which Miller and Beene had acquired from J. L. Bond on July 9, 1921, on the S½ of NW¼ of NE¼ of Section 21, had been lost by prescription. The last producing well drilled on that 20 acres of land was abandoned in January or February 1929. In fact it is conceded by Miller and Beene, with reference to their mineral servitude, that the 10 years prescriptive period commenced not later than March 22, 1929. Our conclusion is that the judgment declaring that the Miller and Beene servitude on the S½ of the NW¼ of NE¼ of Section 21 was lost by prescription is correct.

An appeal from the judgment rendered in this case was taken also by J. N. Bond, individually and as tutor of his minor children, and by the widow and heirs of R. E. Bond. These appellants contend that the prescription which extinguished the several mineral servitudes which were adjudged lost by prescription inured to the benefit of all of the five children of R. P. Bond, including these appellants, and not exclusively to the benefit of Mrs. Fannie W. Bond and Mrs. Bertha Bond Kirkpatrick, who were, respectively, the owners of the lands which were relieved of the servitudes by prescription at the time when the 10 years expired. The appellants refer to the one-half mineral interest formerly owned by Gladney and Kendrick in the NE¼ of NE¼ of Section 21, and the one-half mineral interest of L.

E. and G. A. Davis in the SE¼ of the NE¼ of the same section, and the one-fourth mineral interest formerly owned by the Toklan Royalty Corporation in the SE¼ of the NE¼ of Section 21. The land itself, forming the north 30 acres of this 80-acre tract, was owned by Mrs. Kirkpatrick, and the land forming the south 50 acres was owned by Mrs. Fannie W. Bond, at the time when the servitudes were extinguished by prescription. The judge of the district court sustained the contention of Mrs. Fannie W. Bond and Mrs. Bertha Bond Kirkpatrick that the prescription inured to their benefit by reason of their being, respectively, the owners of the land at the time when the 10 years expired. The facts on which these appellants, J. N. Bond, individually and as tutor, and the widow and heirs of R. E. Bond, base their claim that the prescription of these servitudes inured to the benefit of the five heirs of R. P. Bond, including the appellants, are as follows: R. P. Bond, being the owner of 320 acres of land, made numerous sales of mineral interests in the different portions of the land until he had disposed of all of his mineral rights in the 40 acres forming the NE¼ of NE¼ of Section 21 and all but the one-fourth mineral interest in the E½ of the SW¼, W½ of SE¼ and S½ of NE¼ of Section 21. Thereafter R. P. Bond donated the land in indivision to his five children by a deed which made no reference to his previous sales of his mineral interests in the land. Four years later the children partitioned the land in kind by an instrument in which no mention was made of the outstanding mineral rights; but, thereafter, the five children signed an act amending or explaining the act of partition by declaring that it was made for the sole and only purpose of partitioning the surface rights, and that it was their intention not to divide the royalty interest. Thereafter the five children of R. P. Bond shared in the royalties paid for the oil produced from the wells which were then producing. The production of oil from the 40-acre tract on which all of the mineral rights had been sold by R. P. Bond, and the production from the adjoining 40-acre tract, owned by Mrs. Fannie W. Bond, ceased more than 10 years ago; as a result of which a one-half mineral interest owned by Gladney and Kendrick in the NE¼ of NE¼, and the one-half mineral interest of L. E. and G. A. Davis, and the one-fourth mineral interest of the Toklan Royalty Corporation, in the SE¼ of NE¼ of Section 21, prescribed. At that time the title to the north 30 acres of the 80 acres of land was in Mrs. Kirkpatrick, and the title to the south 50 acres was in Mrs. Fannie W. Bond, by virtue of the act of partition which had been amended. The argument of the appellants, J. N. Bond and others, is that the clause in the amending act, declaring the intention of the parties to be not to divide the royalty interest but to divide only the surface of the land, worked both ways; and that as all of the five heirs thereafter shared in the royalties from the producing

wells they should share also in the benefit resulting to Mrs. Fannie W. Bond and Mrs. Kirkpatrick by the prescription of the servitudes of Gladney and Kendrick, of L. E. and G. A. Davis, and of the Toklan Royalty Corporation. We agree with the judge of the district court that there is nothing in the amendment of the act of partition to justify the conclusion that the intention of the parties was to deviate from the law by which the extinguishment of a mineral servitude by prescription inures to the benefit of the owner of the land at the time of the expiration of the 10 years. The reason why the extinguishment of the servitude inures to the owner of the land at the time when the servitude is extinguished is that the burden or obligation of a servitude is imposed only upon the land, and not upon any person; so that when the obligation is extinguished the extinguishment of it necessarily inures to the owner of the land at the time of the extinguishment. McDonald v. Richard, 203 La. 155, 13 So.2d 712.

The judgment appealed from is affirmed. The costs of this concursus proceeding are to be paid out of the fund deposited in the registry of the court by the Ohio Oil Company.

HAMITER, Justice (concurring).

The Toklan Royalty Corporation, one of the appellants in this interpleader proceeding, assigns error to the holding of the district court that its one-fourth mineral interest in the SE¼ of NE¼ of Section 21, Township 23 North, Range 8 West, Claiborne Parish, has been lost by the prescription of ten years liberandi causa. Its rights stem from the sale, on July 5, 1921, made by R. P. Bond to S. C. Clark of a one-fourth mineral interest in the E½ of SW¼, W½ of SE¼, and S½ of NE¼, all in Section 21. After that transaction one I. R. Bordages acquired from Clark his entire one-fourth mineral rights in the SE¼ of NE¼ of Section 21 (that presently under consideration); and, by mesne conveyances, the Toklan Royalty Corporation obtained such rights from Bordages.

All of the lands affected by Clark's purchase from Bond are contiguous. Moreover, in 1922, producing wells were drilled to and completed in the Buckrange Sand on each quarter-quarter section of the property, except the two comprising the E½ of SW¼; and in the year 1942, some of the wells, particularly those located on the W½ of SE¼, were still producing. There was no production, however, on the SE¼ of NE¼ (that in which Toklan Royalty Corporation acquired mineral rights) after 1929, the wells on that particular tract having been abandoned in 1929 or previously.

It is the contention of appellant, Toklan Royalty Corporation, that the sale from R. P. Bond to Clark created a servitude; that the servitude was indivisible, since it embraced contiguous lands; and that, in

view of its indivisibility, the production upon the W½ of SE¼ of Section 21 inured to the benefit of the transferees of Clark and operated as an interruption of prescription as to the entire servitude, including appellant's mineral interest in the SE½ of NE¼ of Section 21.

The jurisprudence of this court is to the effect that under the provisions of the Revised Civil Code a mineral servitude results from a sale of land with a reservation of a mineral interest therein or from a conveyance by the landowner of a mineral interest in his land. With that conclusion I find myself in complete disagreement. Only two kinds of servitudes—the personal and the predial—are provided for in the Civil Code, as hereinafter shown, and it is my individual and personal belief that neither is created by the mentioned transactions. However, that jurisprudence, in a long line of decisions, has established a rule of property, and I shall recognize and respect it until changed by the Legislature, either through the adoption of a mineral code, which is very much needed in this state, or otherwise.

Since a conveyance or reservation of a mineral interest is made in favor of an individual (not in favor of an estate) it has been referred to variously by this court as the creation of a personal servitude, or of a real right in the nature of a personal servitude, or of a real right of the sort called usufruct. The personal servitude, being one of the two kinds of servitudes recognized by our Civil Code (Article 646), is that attached to the person for whose benefit it is established. It is of three sorts: usufruct, use and habitation.

Notwithstanding that the mineral servitude has been likened unto a personal servitude, the articles of the Civil Code dealing with that classification seldom have been employed by the court in determining mineral interests; the provisions relating to the other recognized kind, the predial or real servitude which is established on one estate for the benefit of another estate, frequently have been applied. Application of the latter provisions, found under Title IV of Book II which treats "Of Predial Servitudes or Servitudes of Land", has been justified apparently on the ground that the articles of that title are declaratory of general principles respecting real rights. Thus, in Sample v. Whitaker, Jr., et al., 172 La. 722, 135 So. 38, 40, Article 802 was applied, as well as Articles 656, 657, 783, 789 and 790, the court observing: "While Article 802 of Civil Code, relative to the suspension of prescription where the servitude is owned by both majors and minors, is found among those articles of the Code treating of real or predial servitudes, yet its provisions, as observed by plaintiffs, are merely declaratory of a general principle to the effect that, as to an indivisible real right or servitude, where the prescription applicable to it is suspended as to one of several joint owners of the right, it is suspended as to all of them, and this necessarily

so, because an indivisible right or obligation cannot be extinguished in part and exist in part."

In Ford v. Williams, 189 La. 229, 179 So. 298, it was held that a mineral servitude is heritable, the court citing and relying on Sample v. Whitaker, Jr., et al., supra, and refusing to follow the provision of Civil Code Article 646, that "Personal servitudes are those attached to the person for whose benefit they are established, and terminate with his life * * *"; also it refused to follow Civil Code Article 753, reading "When the right granted is merely personal to the individual, it expires with him, unless the contrary has been expressly stipulated."

Among the numerous other cases in which mineral interests were determined in accordance with the codal articles relating to predial or real servitudes are: Louisiana Petroleum Company v. Broussard, 172 La. 613, 135 So. 1 (Articles 796 to 800, inclusive); Clark v. Tensas Delta Land Company, 172 La. 913, 136 So. 1 (Articles 655 and 656); Bremer v. North Central Texas Oil Company, 185 La. 917, 171 So. 75 (Article 789); Superior Oil Producing Company v. Leckelt, 189 La. 972, 181 So. 462 (Articles 738 to 741, inclusive, 743, 793); State v. Fontenot, 192 La. 95, 187 So. 66 (applying the doctrine of Sample v. Whitaker, Jr., et al., and Ford v. Williams, supra); Hightower v. Maritzky, 194 La. 998, 195 So. 518 (Articles 738, 740, 741, 792); Ohio Oil Company v. Cox, 196 La. 193, 198

So. 902 (Articles 656, 802); Hodges v. Norton, 200 La. 614, 8 So.2d 618 (Article 656); Standard Oil Company of Louisiana v. Futrel, 204 La. 215, 15 So.2d 65 (applying the doctrine of Sample v. Whitaker, Jr., et al., and Ford v. Williams, supra).

Citing and relying on Sample v. Whitaker, Jr., et al., Ohio Oil Company v. Cox, and Hodges et al., v. Norton, all mentioned above, the Toklan Royalty Corporation maintains, to quote from the brief of its counsel, "that where a servitude is established upon one continuous tract of land, an indivisible servitude is created and that operation upon any part of the land serves to interrupt prescription of the servitude upon any other portion thereof." Unquestionably, the decisions thus relied on, which correctly determined the respective factual situations presented, are authority for the recognized general legal principle that a servitude is indivisible.

The source of the indivisibility of servitude theory, as pointed out in the opinions of the cited cases, is Civil Code, Article 656 (found under the title governing predial or real servitudes), which reads:

"The rights of servitudes, *considered in themselves,* are not susceptible of division, either real or imaginary. It is impossible that an estate should have upon another estate part of a right of way, or of view, or any other right of servitude, and also that an estate be charged with a part of a servitude.

"The use of a right of servitude may be limited to certain days or hours; but thus limited, it is an entire right, and not part of a right.

"From thence it follows that a servitude existing in favor of a piece of land, is due to the whole of it, and to all the parts of it, so that if the land be sold in parts, every purchaser of a part has the right of using the servitude in toto." (Italics ours.)

This article contemplates, among other situations, the establishment of a road across a servient estate for the benefit of a dominant estate owned jointly by two or more persons, and a subsequent division of the dominant estate among its several owners. After the division each owner has the privilege of continuing to use the road as an entirety. Of course, the use of the servitude may be limited to certain days or hours. But each owner can only and must possess an entire right to the road, not a part of a right, because, as pointed out in the article, a physical dividing of the right of way is an impossibility. In other words the right of servitude, *considered in itself,* is not susceptible of division.

Again, there might arise under that article a situation where A, the owner of 30 acres of land, grants in favor of an adjoining estate, consisting of 60 acres of low, swampy land and owned by B, C and D, the privilege of removing from his (A's) property 300 yards of earth to be used in filling the dominant estate. Among those co-owners (B, C and D) the servitude thus established is for an entire, indivisible right; it would be impossible for each to enjoy a part of the right of servitude. And as long as the dominant estate is owned jointly, any one of the co-owners can remove earth from any part of the 30 acres, and his use of the servitude would constitute a use by the others.

But even though the right of servitude itself is not susceptible of division, those co-owners may divide the advantage of the servitude. Civil Code Article 657 states:

"Though the right of servitude be indivisible, and must be established for the whole, and not for a part, nothing prevents the advantage resulting from it from being divided, if it be susceptible of division; as, for example, the right of taking a certain number of loads of earth from the land of another, or of sending to pasture a certain number of animals on the land of another."

This codal provision commences by recognizing the mandate of the preceding Article 656 that a servitude shall be for a whole right, an entire right, not for a part of a right. Then it authorizes a dividing of the advantage resulting from the servitude when that advantage is of the kind that is susceptible of division, such as the right of taking a certain number of loads of earth from the land of another.

To continue with the above hypothetical case, suppose the dominant estate owned

by B, C and D is partitioned in kind, each of those co-owners receiving a specific 20 acres of it; and then D sells his entire 20-acre tract to X. Further, at the time of that partition and sale (in order that each may have dirt for filling his particular parcel of low land) B agrees to take 100 yards of earth from the East 10 acres of A's servient estate, C agrees to take a like amount from the center ten acres, and X (who succeeded to all of D's rights) agrees to take a like amount from the west 10 acres. Would such an agreement be effective? Clearly it would be under the provisions of Article 657. By that agreement the right of servitude is not divided; the complete privilege of enjoying the servient estate remains. Neither has there been an increase of the burden on the land, since only 300 yards of earth (the amount contemplated by the servitude) can be removed from the whole 30-acre tract. Instead of increasing the burden, the agreement, as hereinafter pointed out, might possibly result in a decrease of it. That which is divided by the agreement is only the advantage resulting from the servitude, "the right of taking a certain number of loads of earth from the land of another." As said in Civil Code Article 657 an advantage of that kind is susceptible of division, and nothing prevents its being divided.

Let us consider now certain articles of the Civil Code which relate to the loss by prescription of a servitude and its advantage, found under the title respecting pre-

dial servitudes and in the section entitled "HOW SERVITUDES ARE EXTINGUISHED", employing for the purpose of the consideration the same hypothetical case.

Article 783 provides in part that:

"Servitudes are extinguished:

\*    \*    \*    \*    \*    \*

"By prescription resulting from nonusage of the servitude during the time required to produce its extinction."

\*    \*    \*    \*    \*    \*

According to Article 789, "A right to servitudes is extinguished by the nonusage of the same during ten years."

In the hypothetical case, before a partitioning of the dominant estate, if any one of the co-owners uses the right of servitude, removing dirt from any part of the servient estate as he has the right to do, his enjoyment of it interrupts the current of the ten year non-user prescription with respect to all of the co-owners; for, as stated in Article 801, "If the estate in whose favor a servitude is established belongs to several and has never been divided, the enjoyment of one bars prescription with respect to all."

But after the partitioning of the dominant estate, and after the execution of the agreement relative to the removal of earth from designated areas of the servient estate, each of those who were co-owners, or his successor in title including X, must make

use of the particular area allotted to him, otherwise prescription will run on the servitude, as well as its advantage, in so far as his allotted area is concerned. Supporting this statement is Civil Code Article 803, reading in part:

"Partition of dominant estate—Prescription.—When the estate to which the servitude is due ceases to be undivided, by means of a partition, each of those who were the coproprietors, only preserves the servitude by the use he makes of it, and the others lose it by non-usage during the time required for prescription.

   \*     \*     \*     \*     \*     \*."

And if the ten year non-user prescription is permitted to accrue on any of the designated areas, the servitude to the extent of that unused portion is extinguished; and it is reduced to that which has been preserved, by enjoyment of the right thereby afforded, from the accruing of prescription. To quote Article 798, "If \* \* \* the owner has enjoyed a right less extensive than is given him by his title, the servitude, whatever be its nature, is reduced to that which is preserved by possession during the time necessary to establish prescription."

Dealing with prescription as applied to the right of servitude to draw water from a well, and perhaps of much significance here since the instant appeal involves the drawing of oil from wells, are the following provisions found in Civil Code Article 799 and the second paragraph of Article 803:

"799. Use of incidental right—Loss of all rights.—If the owner has merely enjoyed an accessory right, which was necessary to his right of servitude, he will not be considered as having used his right of servitude.

"For example, if he who has the right of drawing water from the well of his neighbor, has passed often through the land of the latter, and gone to the well without drawing any water during the time required for prescription, he will have lost his right of drawing water without acquiring that of passage, which was merely accessory to the right of drawing water."

   \*     \*     \*     \*     \*     \*

"803.

"If a servitude be due to several persons, but on different days, as the right of drawing water, he who does not exercise his right, loses it, and the estate subject to the servitude becomes free from it, as respects him."

Testing the claim of appellant, Toklan Royalty Corporation, by the above analysis of the mentioned codal articles, it appears that a mineral servitude was created by the sale on July 5, 1921, from R. P. Bond, the landowner, to S. C. Clark of a one-fourth mineral interest in the E½ of SW¼, W½ of SE¼ and S½ of NE¼, all in Section 21. What Clark purchased was a whole right, an entire right, to take one-

fourth of the minerals from Bond's described land; he did not acquire one-fourth of a right (an impossibility) to take such minerals. As was said in Clark v. Tensas Delta Land Company, 172 La. 913, 136 So. 1, 2, "According to article 656 of the Civil Code, it is not possible for a person to have only a part of a servitude on another person's land, although, according to article 657, the benefits or advantages resulting from a servitude may be divided * * *." To paraphrase, by employing the example given in Civil Code Article 657, Clark possessed an entire right (not a part of a right) of taking a certain number of loads of earth from the land of another.

When, thereafter, Clark sold and assigned to I. R. Bordages all of his one-fourth mineral interest in and to the SE¼ of NE¼ of Section 21, a new servitude was not created; involved was merely the transfer of an entire (not of a part) incorporeal real right under the servitude established by the sale from Bond, the landowner, to S. C. Clark. See Deas v. Lane, 202 La. 933, 13 So.2d 270. Neither was the Clark servitude divided; the transfer effected only a division of the advantage of the servitude. By the transaction Clark divested himself of the privilege of taking one-fourth of the minerals from the designated and particularly described 40 acres, along with his right of use and possession of that tract; Bordages acquired those rights, the entire advantage of the servitude to the extent of the mentioned area.

It is on the rights thus received by Bordages that the instant claim of Toklan Royalty Corporation is founded, appellant having acquired, by mesne conveyances, Bordages' one-fourth mineral interest in and to said SE¼ of NE¼ of Section 21.

Admittedly, there has been no enjoyment of the servitude to the extent of that 40-acre tract since 1929, in which year the last well thereon was abandoned and the last production obtained. However, continuous production to date has been had on the W½ of SE¼ of Section 21, a part of the contiguous tract on which the Clark servitude was established. Because of such continuous production and the contiguity of the property, appellant invokes the indivisibility of servitude theory and contends that the current of prescription has been interrupted as to the 40 acres in question.

As before shown, to preserve a servitude, it must be used; a lack of use is the basis for losing it by prescription; it is extinguished by its non-usage during ten years. Civil Code Articles 789 and 3546. And when an entire right in only a determinate part of a servitude is enjoyed or used, thus protecting such part from accruing prescription, to that which is preserved the servitude is reduced. Civil Code Article 798. Moreover, by the reduction necessarily there results a corresponding decrease in the burden on the servitude.

S. C. Clark, immediately after his acquisition from R. P. Bond, the landowner, had the right to enjoy the advantage of the

servitude on all of the land affected. His was the privilege of withdrawing one-fourth of the minerals therefrom. But on selling and assigning to Bordages (Toklan Royalty Corporation's author in title), without any reservation whatever, his one-fourth mineral interest in the SE¼ of NE¼ of Section 21, he relinquished his right to the use, possession and control of that 40 acres; and his rights under the servitude became less extensive.

Bordages, by the transaction, obtained complete control of the servitude to the extent of that 40-acre area, and he, or his assigns, had the entire and exclusive right of enjoying the advantage (one-fourth of the minerals) that it afforded. Such advantage was so enjoyed from 1922 to 1929, during which period producing oil wells occupied the property. But for more than ten years after 1929 the advantage of the servitude respecting the 40 acres was not enjoyed by Bordages or his assigns (including Toklan Royalty Corporation), as was possible, and to that extent the servitude has been extinguished by prescription.

The use (continuous production to date on the W½ of SE¼ of Section 21) made of the remaining portion of the servitude is unavailing to Toklan Royalty Corporation. For more than ten years neither Clark, who originally acquired the servitude, nor any one holding title from him to that remaining portion, has been a co-owner of, or has held any interest whatever in, the servitude respecting the SE¼ of NE¼ of Section 21, now claimed by such appellant.

My conclusion on this appeal is not at variance with the final result of any case in our jurisprudence. True, in some of the opinions there has been used the broad, general language that a "mineral servitude is indivisible and it must stand or fall as a whole". But an examination will reveal that every decision that decreed a suspension or interruption of the ten year non-user prescription under the indivisibility theory was based on a factual situation presenting the element of coproprietorship or co-ownership; in each case someone owned a fractional interest throughout the whole servitude against which prescription was pleaded.

Thus there are cases in which was applied Civil Code Article 802, reading, "If among the coproprietors there be one against whom prescription can not run, as for instance, a minor, he shall preserve the right of all the others." Among these are Sample v. Whitaker, Jr., et al.; State v. Fontenot; Ohio Oil Company v. Cox, and Standard Oil Company v. Futral, all cited supra. In each it was held that prescription on the entire servitude was suspended by the intervention of a legally incapacitated person, both as to him and the major owners. But it is to be noted that the legally incapacitated person, in each instance, owned a fractional interest throughout the whole servitude; he was a co-owner with the

others, and Civil Code Article 802 was correctly applied.

In Hodges v. Norton, supra, which concerned the interruption of prescription by drilling operations, there was present also the mentioned element of coproprietorship or co-ownership. The widow and heirs of Edmond W. Hodges owned a fractional interest throughout the entire servitude; their ownership was common to that of all other owners of rights in the servitude. And the decision that prescription was interrupted by the drilling operations is sustained by Civil Code Article 801, reading: "If the estate in whose favor the servitude is established belongs to several and has never been divided, the enjoyment of one bars prescription with respect to all." That can not be said of the mineral servitude presently under consideration. No person owns an undivided interest throughout the servitude as originally established by the sale from R. P. Bond to Clark.

It is true that the conclusion which I reach herein is in conflict with the holding of this court on the original hearing in Byrd v. Forgotson, 213 La. 276, 34 So. 2d 777, with which I dissented; but that decision is not yet final as the case is now pending on an application for a rehearing.

The cases of Patton v. Frost Lumber Industries, 176 La. 916, 147 So. 33, and Connell v. Muslow Oil Company, 186 La. 491, 172 So. 763, stand simply for the proposi-

tion that once a landowner has granted a mineral servitude on his land he can not thereafter divide the servitude, in which he has no interest, by a partitioning of the land's surface area. Of course this is sound, for, as pointed out by the court, to effect a division of the servitude in that manner would be to force a mineral servitude owner to carry on innumerable drilling operations to keep his servitude alive. Obviously, these cases are not relevant here.

To show that it is not entirely correct to say that "a mineral servitude is indivisible, and it must stand or fall as a whole", we need only analyze certain decisions of this court in which servitudes, to use the expression of Civil Code Article 798, were actually reduced to that part which was preserved. First we consider the Sample v. Whitaker cases, both of which arose out of the same transaction. In a single deed of date November 20, 1911, S. G. Sample sold and conveyed to York Whitaker, Jr., with reservation of all of the mineral rights thereto, a continuous tract of land containing 160 acres and described as the S½ of the NE¼ and E½ of the SE¼, Section 5, Township 13 North, Range 13 West, DeSoto Parish, Louisiana. By this deed one mineral servitude on the entire 160 acres was established in favor of Sample. Later, York Whitaker, Jr., sold to Isaac Whitaker, without mentioning the reservation, the S½ of NE¼ (80 acres). After the elapse

of more than ten years from the date of the creation of the servitude, Sample and his children (his wife having died in the meantime and the property belonged to the community estate) sued in two separate actions to be recognized as the owners of the mineral rights in the entire 160 acres, they impleading in one York Whitaker, Jr., and in the other Isaac Whitaker. The Isaac Whitaker suit, in which the defendant had pleaded the prescription of ten years acquirendi causa, was the first to reach this court. 171 La. 949, 132 So. 511. Holding that a mineral servitude can be extinguished by the prescription thus pleaded, we remanded the case so that evidence could be received on the plea. Subsequently, the York Whitaker, Jr., suit, involving defendant's plea of prescription of ten years liberandi causa, was considered by us on appeal. 172 La. 722, 135 So. 38 (cited supra). The court applied the provisions of Civil Code Article 802, as above shown; it overruled defendant's plea of prescription; and it decreed to be in full force and effect the servitude in favor of the Samples on the 80 acres belonging to York Whitaker, Jr. Therein it was said that the servitude was indivisible and that the minority of some of the co-owners had suspended prescription as to both the majors and the minors. Less than a year later the Sample v. Isaac Whitaker action (that previously remanded) returned here. 174 La. 245, 140 So. 36. On the hearing the court maintained the plea of ten years' prescription

acquirendi causa respecting the Isaac Whitaker 80-acre tract and rejected the demands of the Samples. The effect of that decision, obviously, was to reduce the Sample servitude—the servitude that was established on the entire 160 acres of contiguous lands when S. G. Sample, on November 20, 1911, and by a single deed, transferred the lands to York Whitaker, Jr., reserving all of the minerals.

Similarly the decision in Arent v. Hunter et al., 171 La. 1059, 133 So. 157, 162, effected a reduction of a servitude. In that case Hunter and McCormick, as owners in fee of a large tract of land, granted to the Producers' Oil Company a mineral lease on five non-contiguous parcels of the land. Later, those fee owners sold the land, reserving unto themselves all of the mineral rights therein, thus creating in their favor a single mineral servitude on the entire tract. Eventually, by numerous transactions, plaintiff Arent became the owner of the land and also of all of the mineral rights therein, except those in and under the five non-contiguous parcels covered by the Producers' Oil Company lease. The excepted mineral rights were still owned by Hunter and McCormick; all others had been sold or renounced by them to Arent. On one of the non-contiguous parcels there was obtained a producing gas well. In his suit against Hunter and McCormick to be declared the owner of the mineral rights in all of the five non-contiguous parcels, Arent pleaded the prescription of ten

years liberandi causa. The court, in maintaining the plea as to all of the parcels except that on which the well was drilled, observed: "Long prior to January 16, 1928, the day on which the prescription was interrupted, Hunter and McCormick had sold or renounced to the plaintiff, Arent, the owner by a prior purchase of the tract of land itself, all the mineral rights on the 987.26 acres of the tract not included in the grant to the Producers' Oil Company, which served to connect the five separate parcels of land covered by the grant. Therefore, when Arent, the owner of the land, also became the owner of the servitude resting thereon, the title of the latter became merged with the title of the former and was extinguished by confusion. Civ.Code Art. 783. When this occurred, Hunter and McCormick owned no mineral rights on the Seale place, except those on the five noncontiguous parcels of land covered by the grant to the Producers' Oil Company. The servitude upon the five noncontiguous parcels of land became five distinct servitudes, and the exercise of the servitude on one of the parcels by the withdrawing of gas from the well drilled thereon some nine years before, did not constitute an exercise of the servitude upon the four noncontiguous parcels. * * *"

Again in Spears v. Nesbitt, 197 La. 931, 2 So.2d 650, this court effected a reduction of a mineral servitude, holding that prescription, because of non-usage, had accrued as to one portion of it, but not as to the remainder, which was continued in full force.

To summarize, with reference to the claim involved in the instant appeal, Clark, who acquired the servitude from Bond, could not divide the right that he received. As pointed out above the right of servitude, considered in itself, is not susceptible of division; it is indivisible. It is impossible to transfer to another a part of a right. But Clark could and did divide the advantage of his right of servitude. To Bordages he conveyed the entire advantage of the servitude as to the SE¼ of NE¼ of Section 21, which ultimately was acquired and owned by appellant, Toklan Royalty Corporation. Thus Bordages, or his successor, had a full and complete right to explore for and reduce to possession the minerals under the 40 acres, with the obligation, of course, of distributing the minerals obtained according to the ownership thereof. Since, however, that advantage was not enjoyed for more than ten years, and during that period there existed with respect to it no coproprietor relationship between its owner and a legally incapacitated person or any one owning an interest in the used portion of the original servitude, the advantage has been lost by prescription and the servitude to that extent extinguished and reduced, just as was held by the district court. This conclusion is supported not only by the provisions of the Civil Code, but also by logic.

Clearly it would be unreasonable to hold that the efforts or status of a person who is without any interest whatever in the advantage of a servitude can interrupt or suspend the current of prescription as to that advantage.

For the foregoing reasons I concur in the decree rendered on the appeal of the Toklan Royalty Corporation. Also, I concur in the decree as it respects the other appeals in this interpleader proceeding.

FOURNET, Justice (concurring).

I do not subscribe to the reasons supporting that portion of the majority opinion treating of the so-called Toklan Royalty Corporation mineral interest.

As pointed out by the writer in the case of Byrd v. Forgotson, 213 La. 276, 34 So.2d 777, "When oil was first discovered in this state and the interests of those asserting rights therein became controversial, the courts decreed that the sale of a mineral was nothing more than the granting of a right or privilege to go upon the land for exploration and exploitation purposes, classified such a right as being in the nature of a servitude, and applied the provisions of the Revised Civil Code relative to servitudes in determining the rights of those claiming such an interest."

According to the Revised Civil Code, a servitude can only be created by the owner of the land. Article 729; Hodges v. Norton, 200 La. 614, 8 So.2d 618. Such rights

"are not susceptible of division, either real or imaginary * * *." Article 656; Lee v. Giauque, 154 La. 491, 97 So. 669; Patton v. Frost Lumber Industries, Inc., 176 La. 916, 147 So. 33; Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; Ohio Oil Company v. Cox, 196 La. 193, 198 So. 902; Hodges v. Norton, 200 La. 614, 8 So.2d 618. The right "is extinguished by the nonusage of the same during ten years" (Articles 789, 3546; Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207; Nabors Oil & Gas Co. v. Louisiana Oil Refining Company, 151 La. 361, 91 So. 765; Wemple v. Nabors Oil & Gas Co., 154 La. 483, 97 So. 666), but "If among the co-proprietors there be one against whom prescription can not run, as for instance a minor, he shall preserve the right of all of the others." Article 802, Sample v. Whitaker, 172 La. 722, 135 So. 38, (though this article and the jurisprudence thereunder has since been superseded by Act No. 232 of 1944).

It is difficult for me to follow the reasoning in the majority opinion to the effect that although a servitude is indivisible and the drilling on any part of the land affected thereby preserves the whole servitude (Lee v. Giauque, 154 La. 491, 97 So. 669; Sample v. Whitaker, 172 La. 722, 135 So. 38; Patton v. Frost Lumber Industries, Inc., 176 La. 916, 147 So. 33; Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; Ohio Oil Co. v. Cox, 196 La. 193, 198 So. 902; Hodges v. Norton, 200 La. 614, 8 So.2d

618), the advantages flowing therefrom are nevertheless susceptible of division and that one who acquires a portion of a servitude affecting a surface area that has not been developed within the ten-year period, even though development was had on the remaining portion thereof, loses his rights by prescription.

It is equally difficult for me to reconcile the holding in this case with the decision of this court in Hodges v. Norton, 200 La. 614, 8 So.2d 618, 621, where we squarely held that the conveyance by Selby to Norton of a mineral interest in and to 220 acres of a 480-acre tract acquired by Selby did not have the effect of dividing the servitude and that the drilling on a portion thereof other than the part conveyed to Norton within the 10 year prescriptive period preserved the whole servitude although more than 10 years had elapsed since the original servitude was created. In that case the court said most specifically: "The land upon which the servitude was established is one continuous tract. There was but one indivisible servitude and the mere fact that the mineral owners conveyed undivided interests in the right to others did not have the effect of dividing it. * * * The reason for this is that a servitude can only be created by the owner of the land. Therefore, when the widow and children of E. W. Hodges conveyed an undivided one-fourth interest in the minerals to Selby, the servitude covering the entire land remained intact. Like-

wise, when Selby conveyed to Norton a one-fourth interest in the minerals in and under 220 acres of the tract, the servitude was not divided and exercise of the servitude on any portion of the land preserved it as to the whole."

In the majority opinion it is stated that this decision is reconcilable with the judgment rendered in the instant case "by the fact that in Hodges v. Norton, Mrs. Augusta Ann Hodges and her 10 children, who were co-lessors with the landowner, Andrew J. Hodges, in the lease under which the drilling operations were conducted, retained a one-fourth mineral interest in the whole 440 acres conveyed by the original mineral servitude. In the instant case there was no such joint ownership of the mineral rights by Clark and the Toklan Royalty Corporation."

It is difficult for me to see how the fact that Mrs. Hodges and her 10 children (Selby's authors in title) retained an interest in the entire servitude would have the effect of preserving the rights acquired by Norton, for it was not that fact that had the effect of interrupting the prescription then running but instead the fact that the servitude was indivisible and that exercise of the servitude by the drilling on a portion thereof, although not on that part affected by the interest acquired by Norton, had the effect of preserving the servitude as to the whole.

Nor can I find any basis for the statement in the majority opinion that "The

decision in Spears v. Nesbitt et al., 197 La. 931, 2 So.2d 650, is a precedent for the instant case," (meaning the holding in the majority opinion here), as is also the holding in the companion case of Robinson v. Horton, 197 La. 919, 2 So.2d 647, 648, for a mere reading of these cases will show that the divisibility of a servitude was not at issue in either of them and that the expression quoted in reliance from the Spears case was merely used in explaining the intention of the parties in that case in executing a unitization contract pooling all of their interests for development purposes.

Nor is there any basis for the statement that it was held in the Robinson case that the prescription running against the Trinity Company's servitude lying in the western half of the section was interrupted by the drilling operations on another portion of the land affected by the lease. On the contrary, we specifically stated it was not necessary to pass on that question because we maintained the contention of the defendants that "since the plaintiff entered into a joint lease with them, pooling her mineral interests with theirs and specifically agreeing that each should receive a pro rata share of the royalty that might be due from any portion of the land, irrespective of where the oil or gas was found, they are entitled to their share of the royalty due out of the oil produced from plaintiff's property under the terms of the lease, i. e., according to their interest as it appears in proportion to the entire mineral acreage, regardless of whether or not the well is on the property affected by their servitudes," declaring, "They have contracted; they are bound by their contract; and *the question of whether the servitudes, owned by the defendants in these two cases at the time of the confection of the contract, were actually used by drilling is immaterial."* (Italics mine.)

However, since a majority of the court in applying the second paragraph of Article 803 of the Revised Civil Code have construed the same, when read in connection with other articles of the Code, to mean that even though a servitude is indivisible, nevertheless the advantages that flow therefrom may be divided by the owner thereof and that so divided a portion not developed prescribes in ten years, I am concurring in the results reached for the reason that in granting a rehearing in the case of Byrd v. Forgotson, 213 La. 276, 34 So.2d 777 handed down on February 19, 1945, where this identical issue was raised and decided to the contrary, it was agreed that a rehearing would be held up in the instant case pending a decision in the Byrd case on rehearing so as to afford to the litigants and to all other parties who might be interested in the matter, an opportunity to present their views to the court.

For these reasons I respectfully concur.

On Rehearing

HAWTHORNE, Justice

Originally this case involved the claims of several parties to the proceeds of a one-eighth royalty in certain oil produced by the Ohio Oil Company from a tract of land situated in Claiborne Parish, and was in the nature of a concursus proceeding. On February 11, 1946, this court adjudicated the rights of all claimants in this suit, and thereafter refused a rehearing to all applicants except Toklan Royalty Corporation, and as to it a rehearing was granted.

On original hearing we affirmed a judgment of the lower court which decreed that the ·Toklan Royalty Corporation's one-fourth mineral interest in a 40-acre tract of land had been extinquished by the prescription of 10 years liberandi causa.

On February 19, 1945, this court handed down an opinion in the case of Byrd et al. v. Forgotson et al., 213 La. 276, 34 So.2d 777. The principles of law to be applied in the Byrd case and in the Ohio Oil Company case are identical, and the issues are the same, except that in the Byrd case the question is whether prescription of the servitude was suspended by the minority of one of the servitude owners, while in the Ohio case the question is whether prescription of the servitude was interrupted by the exercise of the servitude by one of the servitude owners. In each case the original mineral owner had divested himself of title to all the min-

eral interests acquired by him in a designated and particular portion of the tract covered by the original grant, which grant by the landowner, of course, created the servitude.

Application for rehearing was pending in the Byrd case at the time the present case was argued and submitted to this court. Both cases then being before the court, careful consideration was given to each. Thereafter our original opinion and decree was rendered in the instant case, and at that time a rehearing was granted in the Byrd case for the reason that the result reached in the decision in the instant case was diametrically opposite to that reached in the decision theretofore rendered in the Byrd case.

This court, realizing that the decision to be rendered in each of these two cases is of vast importance for the reason that each will regulate valuable property rights in this state, in due course granted the application for rehearing of the Toklan Royalty Corporation, so that all litigants and parties interested, as pointed out by Justice Fournet in his concurring opinion in the Ohio case, might have an opportunity to present their views to the court. Accordingly both cases were argued and submitted on rehearing at the same time, on October 7, 1947, and both are now before the court for decision.

There is no dispute as to the facts out of which the claim of Toklan Royalty Corporation arises, and, as they have been completely set forth in our original opinion,

there is no necessity of reiterating or setting them out in detail again.

Counsel supporting the claim of Toklan Royalty Corporation contend that our original decree rendered in this case is contrary to the established jurisprudence of this state and does violence to Article 656 of the Revised Civil Code, which provides that the rights of servitudes, considered in themselves, are not susceptible of division, either real or imaginary; or, stated somewhat differently, counsel argue that the decree affirming the judgment of the lower court, to the effect that Toklan Royalty Corporation had lost its one-fourth mineral interest in the 40-acre tract by non-usage for a period of 10 years, divided the servitude. They base their argument on the fact that there was but one servitude established, that by the landowner, R. P. Bond, to S. C. Clark covering the tract of 240 acres, and contend that, this being so, our holding that Clark's use on 200 acres (there being only one servitude) did not enure to the benefit of Toklan Royalty Corporation, a co-owner of the servitude, divided the servitude.

Counsel in brief state that mineral rights in Louisiana are neither personal servitudes nor real servitudes within the strict definitions of the Code, and point out that this is true for the reason that a personal servitude terminates with the death of its beneficial owner and a predial servitude is established only for the benefit of an estate, neither of these characteristics being true of a mineral right, and that this court has consistently held mineral rights to be real rights in the nature of servitudes, subject by analogy as near as may be to the provisions of the Civil Code relating to real or predial servitudes; or, as stated in the exact language used in one of the briefs, as follows: "For a quarter of a century and more, this Court has consistently held that the sale or reservation of minerals creates a real right, analogous to, or, as so frequently said by the Court, in the nature of a servitude. And during that time it has developed and extended that doctrine, by the analogical application of those provisions of the Civil Code which relate to real or predial servitudes, and it has refused to attribute to this real right, in the nature of a servitude, those characteristics, which are essential attributes or characteristics of personal servitudes."

We now come to a consideration of the various articles of the Code insofar as they may be applicable and pertinent to the issues here involved.

Under Title IV, which deals with predial servitudes or servitudes of land, we find Articles 656 and 776, which read as follows:

"Art. 656. The rights of servitudes, considered in themselves, are not susceptible of division, either real or imaginary. It is impossible that an estate should have upon another estate part of a right of way, or of view, or any other right of servitude, and also that an estate be charged with a part of a servitude.

"The use of a right of servitude may be limited to certain days or hours; but thus limited, it is an entire right, and not part of a right.

"From thence it follows that a servitude existing in favor of a piece of land, is due to the whole of it, and to all the parts of it, so that if the land be sold. in parts, every purchaser of a part has the right of using the servitude in toto."

"Art. 776. If the estate for which the servitude has been established, comes to be divided, the servitude remains due for each portion, provided that no additional burden accrue thereby to the estate which is subject to the servitude.

"Thus, for instance, in case of a right of passage, all the owners are bound to exercise that right through the same place."

The pertinent articles on prescription of an indivisible servitude are found in the same title and are as follows:

"Art. 789. A right to servitude is extinquished by the nonusage of the same during ten years."

"Art. 801. If the estate in whose favor the servitude is established belongs to several and has never been divided, the enjoyment of one bars prescription with respect to all."

"Art. 803. When the estate to which the servitude is due ceases to be undivided, by means of a partition, each of those who were the coproprietors, only preserves the

servitude by the use he makes of it, and the others lose it by nonusage during the time required for prescription.

"If a servitude be due to several persons, but on different days, as the right of drawing water, he who does not exercise his right, loses it, and the estate subject to the servitude becomes free from it, as respects him."

▮ We concede that dominant and servient estates, which are necessary for the establishment of predial servitudes, are not necessary under our jurisprudence for the establishment of mineral servitudes. However, this court has consistently applied to mineral servitudes Article 789, which provides that a servitude is extinguished by non-usage of the same during 10 years, and Article 801, which provides that, if the estate in whose favor the servitude is established belongs to several and has never been divided, the enjoyment of one bars prescription with respect to all.

Both of these articles are found under title of our Code dealing with predial servitudes, and both contemplate, as they must, a servient and a dominant estate; yet, notwithstanding this fact, both have been made applicable to mineral servitudes, as stated hereinabove, and they have been applied, as pointed out by counsel, by analogy and as near as may be to problems arising in connection with mineral servitudes.

In our opinion Clark's sale of all of the mineral interests he owned in a particular

portion of the original tract is analogous to the division of the dominant estate by the sale of a portion of it. Let us determine what effect a division of the dominant estate would have on the indivisibility of a servitude existing in favor of it, and on the prescription of that servitude.

Applying the provisions of the quoted articles, let us assume that A, the owner of a servient estate, has established a servitude of passage in favor of the dominant estate, owned in indivision by B and C. B and C divide equally the estate in whose favor the servitude was established. Under Article 776 it is clear that the servitude or right of passage remains due for the portion of the estate allotted to B and likewise remains due for the portion allotted to C.

How, exactly, has the division of the dominant estate affected the servitude? Obviously the servitude or right of passage, considered of itself, has not been divided. Under Article 656, B does not now have half a right of passage and C half a right of passage. Each still has a whole right of passage. However, the area or portion of the estate from which B and C may exercise their servitude has been limited by the division of the estate, without any additional burden's accruing to the servient estate of A. B may now exercise his right only from that portion of the dominant estate which he owns, and C may exercise his right only from that portion which he owns. The servitude therefore has not been divided, but the estate to which it is due has been divided.

How does this division of the dominant estate affect prescription of the servitude? It is clear under Article 801 that, prior to the division of the estate, exercise of the right of passage by either B or C would bar prescription as to the other. It is likewise clear under Article 803 that after the division of the dominant estate the use B makes of the servitude will not preserve the servitude as to C, or vice versa. If B does not exercise the right of passage, he loses it for his portion of the dominant estate. This is true not because the servitude was divided but because the dominant estate was divided, and, under the plain provisions of the Code, after division of the dominant estate each owner has the burden of preserving the right of servitude as to his portion of the estate.

It is true that Article 803 and Article 776 seem to be applicable only to a partition by the owners of the dominant estate, for they use the language that "When the estate to which the servitude is due ceases to be undivided, by means of a partition" and "If the estate for which the servitude has been established, comes to be divided". However, in our opinion, it would be illogical to say that the Code contemplates that separate owners of parts of the dominant estate could preserve the servitude for each other if the estate was sold in parts but could not preserve it for each other if the dominant estate was partitioned by

the co-owners; therefore the effects in the assumed case would obtain if B, the owner of a dominant estate, had sold a portion to C.

We now apply the assumed case and the articles of our Civil Code applicable thereto, by analogy, to the case at bar. In doing so it follows that R. P. Bond, who granted the mineral servitude, is in the position of A, the owner of the servient estate, and S. C. Clark is in the position of B, the owner of the dominant estate in favor of which the servitude was granted. I. R. Bordages (Toklan Royalty Corporation by mesne conveyances) is in the position of C, to whom part of the dominant estate was sold. Clark must take the position of the dominant owner, and his act of selling to Bordages all of the mineral rights acquired by him on a portion of the area subject to the servitude must be analogous to B's sale of part of the dominant estate to C. By analogy, what Clark did was to divide the dominant estate; he did not divide the servitude, for Clark and Bordages still had the whole right to explore for minerals. Clark by his act of sale merely limited the place on which each could exercise that right. Clark and Bordages, by analogy, became owners of portions of the dominant estate, and it follows that each must preserve the right to his portion or limited area, or he loses it under Article 803, Paragraph 1, of the Civil Code.

We concede that analogy between the assumed case and the case at bar is somewhat difficult, not only because the two estates which are necessary for predial servitudes are not necessary for the creation of a mineral servitude, but also because predial servitudes themselves are not subject to alienation while mineral rights are. However, as pointed out hereinabove, this court has applied articles dealing with predial servitudes to mineral servitudes, among these being Article 801 dealing with a dominant estate undivided, where the enjoyment of one-co-owner bars prescription with respect to all, and Article 789, which provides that a right to servitude is extinguished by non-usage of the same during 10 years. These articles having been applied to mineral servitudes in no other way except by analogy, we find there is full precedent for us in the case here under consideration to apply, likewise by analogy, the first paragraph of Article 803. When this article is so applied, it naturally follows that, since Toklan Royalty Corporation did not exercise its right, the servitude prescribed by non-usage as to the 40-acre tract in question, for the exercise of the right on the 200 acres on which Clark could exercise the servitude could not enure to the benefit of Toklan Royalty Corporation for the purpose of interrupting prescription.

From this it can be readily seen that the decree originally rendered in this case in first hearing has in no way destroyed or affected the rule or proposition of law that a servitude is indivisible. In other

words, the servitude was not divided by Clark's sale to Bordages, and it was not divided by the court's decree that Toklan Royalty Corporation's right had prescribed although Clark's right still remained in full force and effect. ·

In support of its contention that our original decree rendered in this case is erroneous, Toklan Royalty Corporation relies principally on the cases of Lee et al. v. Giauque, 154 La. 491, 97 So. 669; Patton et al. v. Frost Lumber Industries, Inc., et al., 176 La. 916, 147 So. 33; Connell v. Muslow Oil Co., Inc., et al., 186 La. 491, 172 So. 763; and Hodges et al. v. Norton et al., 200 La. 614, 8 So.2d 618.

All of these cases, as well as others cited by counsel, were fully discussed and analyzed at length in the majority opinion rendered on original hearing in this case, and the result reached in our opinion on first hearing was shown not to be in conflict with the holding of any of these earlier cases. We are still of that opinion.

For example, as stated in our original opinion, the case of Lee et al. v. Giauque, supra, "* * * is authority merely for the proposition that where the mineral rights are reserved on two or more separate tracts of land the effect is to establish as many servitudes as there are tracts of land, and the exercise of the right upon one of the tracts will prevent the right from being extinguished by prescription on that tract, but not on any noncontiguous tract of land".

Counsel in citing these cases rely on statements and expressions found therein in support of their contention in this case, as, for instance, the following statement from Lee et al. v. Giauque [154 La. 491, 97 So. 670]: "We are of opinion that the exercise upon any part of a continuous tract of land of a servitude extending over the whole tract preserved the servitude over the whole for the reason that there is but one servitude on the whole tract."

We fully subscribe to the principle of law as stated in this passage, but this principle of law has no application where the owner of the mineral servitude himself, by the sale of all the mineral rights acquired from the landowner in a designated area, limits the area or place on which he as well as his vendee may exercise the servitude, because these facts are analogous to those contemplated by Article 803, Paragraph 1, and that article is therefore the law applicable to these facts.

In Patton et al. v. Frost Lumber Industries, Inc., et al., supra, this court, in discussing the contention of plaintiffs set out in their supplemental brief to the effect that the issue there involved should be solved by the principle of law expounded in Articles 776 and 803 of the Civil Code (which articles we have quoted above and found to be applicable in the instant case), correctly said [176 La. 916, 147 So. 36] : "* * * What these articles mean is that, if two or more persons who

own in indivision an estate *to which a servitude is due,* or for which it has been established (such as that of natural drain), partition the same in kind, each of the parts is still due the servitude originally due the whole estate. But, after the partition, the respective proprietors can reserve the servitude as to his estate only by making use of it. Either or both will lose it by nonusage during the time required for prescription."

In that case Frost Lumber Industries owned a continuous tract of land of approximately 30,000 acres. On January 12. 1917, it established by convention a mineral servitude on the entire tract. Thereafter, in 1918, plaintiff Patton acquired from Frost Lumber Industries 40 acres of this tract, and plaintiff McLeod by mesne conveyances from Frost Lumber Industries acquired another tract containing 40 acres. In making the conveyances covering these two tracts of land, the vendor, Frost Lumber Industries, reserved all the oil, gas, and other minerals in each tract. The owner of the mineral servitude, Federal Petroleum Company, exercised it by drilling and producing gas within the 10-year period, but not on either of the tracts conveyed to plaintiffs. Plaintiffs contended that a mineral servitude was created by Frost Lumber Industries in its reservation when it sold these two tracts, and that, since it had not exercised this servitude, the servitude had prescribed, more than 10 years having elapsed since the

reservation was made. This court found that the servitude was created not in the reservation made by Frost Lumber Industries in its sale of these two tracts of land, but by its sale of the minerals to Federal Petroleum Company, and that Frost Lumber Industries by its reservation did not intend to establish a servitude but intended to protect the one already established, and that, since the servitude owner had exercised it by drilling and producing gas within the 10-year period from the date of the servitude's creation, the servitude was still in full force and effect.

Under these facts, we think the court correctly stated in that case that manifestly these articles of the Code relied upon by plaintiffs (Articles 776 and 803) had no application to the issue involved in the case. This is true, for by analogy Frost Lumber Industries at the time the servitude was created was in the position of a servient owner, and Federal Petroleum Company was in the position of the dominant owner or the one to whom the servitude was due. Frost Lumber Industries in its sale of each of the 40-acre tracts which the plaintiffs owned did not divide the dominant estate; consequently the articles relative to the partitioning of dominant estates could have no application to the acts of the Frost Lumber Industries.

In the majority opinion on original hearing, we pointed out in our discussion of that case "* * * that the owner of a

mineral servitude could not be affected adversely, so far as the liberative prescription was concerned, by the sale by the landowner of numerous small parts of the land burdened with the servitude. The doctrine of that case is simply that the owner of a tract of land burdened with a mineral servitude cannot do anything to lessen the value of the servitude to its owner without his consent".

In the case of Connell v. Muslow Oil Co., Inc., et al., supra, plaintiff claimed by the prescription of 10 years acquirendi causa the mineral rights in 40 acres of land acquired by him in January, 1919, without any reservation or mention of mineral rights in the land. Previous to this acquisition the Natalie Oil Company had sold 80 acres of land, in which plaintiff's 40-acre tract was included, reserving the minerals on the entire tract. No well was drilled on plaintiff's land, but there was drilling and production on other land subject to the servitude. This court found that plaintiff's plea was without merit for the reason that the Natalie Oil Company and its successors in title had retained possession of the mineral rights or servitude on the whole of 80 acres of land, of which the 40 acres in question formed a part, by the drilling of a well on land subject to the servitude and by production of oil by the lessee of Natalie Oil Company and its successors in title continuously since the well was brought in in 1912. The plaintiff there-

fore never had the possession necessary for acquisitive prescription.

We pointed out in the original opinion that that decision had no application to the instant case, but counsel no doubt place great reliance on the following expression therefrom [186 La. 491, 172 So. 766]: "The rule of law that controls this case is that the exercise of mineral rights, or servitude, on any part of one continuous tract of land upon which the servitude is imposed is considered exercise of the right on the whole tract."

As we have stated above in our discussion of Lee et al. v. Giauque, this is a correct principle of law, but it has no application in the instant case.

The facts in Hodges et al. v. Norton et al., supra, have been clearly, concisely, and correctly set forth by Chief Justice Charles A. O'Niell, the author of the original opinion rendered herein. As there pointed out, Mrs. Augusta Ann Hodges and her children owned a one-fourth mineral interest in the whole 440 acres subject to the mineral servitude, or, in other words, she and her children owned a fractional interest throughout the tract in common with all other owners of the servitude; thus a co-proprietorship existed. For this reason the facts in that case are distinguishable from the facts in this case, and the prescription of 10 years liberandi causa had not accrued, under the provisions of Article 801 of the Civil Code. The decree in that case is there-

fore in no way in conflict with the result which we have reached in this case.

Counsel for Toklan Royalty Corporation rely on the following language found in that case to show that the result in this case on original hearing was incorrect: "The land upon which the servitude was established is one continuous tract. There was but one indivisible servitude and the mere fact that the mineral owners conveyed undivided interests in the right to others did not have the effect of dividing it. * * * The reason for this is that a servitude can only be created by the owner of the land. Therefore, when the widow and children of E. W. Hodges conveyed an undivided one-fourth interest in the minerals to Selby, the servitude covering the entire land remained intact. Likewise, when Selby conveyed to Norton a one-fourth interest in the minerals in and under 220 acres of the tract, the servitude was not divided and exercise of the servitude on any portion of the land preserved it as to the whole."

We agree that, when E. W. Hodges and Mrs. Augusta Ann Hodges conveyed the land to Andrew J. Hodges and reserved one-half of the minerals over the entire tract of 440 acres, one, and only one, indivisible servitude was created, and the fact that subsequently thereto the widow and heirs of E. W. Hodges conveyed one-fourth of the minerals in and under the entire tract to Selby, and that Selby in turn conveyed the one-fourth acquired by him only on 220 acres of the tract, did not and could not have the effect of dividing the servitude. Likewise we agree with the conclusion therein that the exercise of the servitude on any portion of the tract subject to the servitude preserved it as to the whole tract, not for the reason advanced therein, but because the servitude owners were co-proprietors under Article 801 of the Civil Code.

The problem of the prescription of the servitude in that case, as in this one, arose as a result of a sale by a servitude owner of a mineral interest in a particular part of the tract subject to the servitude. In that case the court reached the right result, as pointed out before, but applied the wrong principle of law. The problem should have been solved by the application of Article 801 of the Civil Code, but it is apparent from the decision that the court did not think it necessary to consider Article 801. This is because the court did not realize that Selby's sale to Norton of his one-fourth interest in the minerals in 220 acres had the effect, under Article 803 of the Code, of dividing the dominant estate as between them, and that, but for their co-proprietorship with the widow and heirs of E. W. Hodges, the user of the servitude on the area retained by Selby would not have interrupted the running of prescription as to the area held by Norton.

In truth, the first paragraph of Article 803 has never heretofore been considered in determining whether the running of prescription has been suspended or interrupted in ·the case where an owner of a mineral servitude is limited to a particular area of the tract subject to the servitude for the exercise of his right. Application of Article 803 results from new thought founded on further study and research into the vexing problems which we have been called upon to decide and from our efforts to apply consistently, by analogy, the articles of the Code relating to predial servitudes in the development of the mineral law of this state.

With the exception of Lee et al. v. Giauque, supra, all of the cases discussed above by us and many others were fully analyzed by Justice Hamiter in his concurring opinion filed herein on original hearing, and he likewise pointed out that none of the results reached in any of these cases is in any way in conflict with our decision herein.

We have already stated that the principle of law to be applied in this case and in the case of Byrd et al. v. Forgotson et al., 213 La. 276, 34 So.2d 777, is the same, and, in a decision handed down this day in the Byrd case, the right to apply for a rehearing was granted to defendants-appellees herein, and therefore in fairness to Toklan Royalty Corpora-

tion we are of the opinion that the same right should be expressly reserved to it.

For the reasons assigned herein, our decree rendered on original hearing, affirming the judgment of the lower court decreeing that the mineral interest of Toklan Royalty Corporation in the 40 acres forming the SE ¼ of the NE ¼ of Section 21, Township 23 North, Range 8 West, has been extinguished by the prescription of 10 years, is reinstated. The costs of these proceeedings are to be paid out of the sum deposited in the registry of the court by the Ohio Oil Company. The right is expressly reserved to Toklan Royalty Corporation to apply for a rehearing.

O'NIELL, C. J., concurs in the decree for the reasons given in the majority opinion rendered on the original hearing of this case.

BOND, J., absent.

FOURNET and PONDER, JJ., dissent.

HAMITER, J., concurs for the reasons given in his concuring opinion on the original hearing and also for the reasons assigned by HAWTHORNE, J., herein.

FOURNET, Justice (dissenting).

The question presented for our consideration here is: Can an estate, in the light

of our jurisprudence that a mineral servitude is indivisible and *"must stand or fall as a whole,"* be relieved of the servitude on a designated part of its acreage, even though the remaining acreage has been developed well within the prescriptive period fixed by law for its extinguishment because of nonuse, simply because the person purchasing the fractional portion of the servitude affecting the designated acreage from the primitive servitude owner failed to develop the area assigned to him within ten years?

The proper solution of the problem posed by this question is of the utmost importance not only to the bench and bar, but also to the petroleum industry as a whole and to the innumerable people who have dealt with mineral rights in this state either by their reservation, purchase, or sale of such rights. That the problem has proved to be complex and that it has given us much concern is evident from the fact that during the many months this case has been pending here, as well as the companion case of Byrd v. Forgotson, La.Sup., 34 So.2d 777, argued on rehearing the same day as this case but originally submitted to us for decision on December 19, 1944, the court, because of the divergence of the views of its members, has not only been unable to render a final decision ere this but, even today, the decision being handed down does not reflect the view of the majority of the court. It is, instead, maintained by three different supporting opinions, all based on entirely different concepts of the law relative to mineral rights.

With all due respect to these views, I find I cannot subscribe to any of them or to the result arrived at by the majority of the court, for it is my firm belief the conclusion reached does violence to a rule of property that has been firmly established by a long line of decisions in this state and that affects what we have, ever since 1918, recognized as "the most valuable property in the state" (De Moss v. Sample, 143 La. 243, 78 So. 482, 484), which property has, since that date, mushroomed into an industry of almost unbelievably gigantic proportions.

The error into which the author of the main opinion has fallen, in my opinion, lies in the fact that he has applied Paragraph 1 of Article 803 of the revised Civil Code, wherein it is declared that "When the estate to which the servitude is due ceases to be undivided, by means of a partition, each of those who were the coproprietors, only preserves the servitude by the use he makes of it, and the others lose it by nonusage during the time required for prescription," to a mineral servitude, substituting, by analogy, the owner of the so-called mineral servitude for the dominant estate. According to his opinion he has done this because he found that some of the articles of the code previously applied by this court in its decisions touching on mineral servitudes were under Title IV of the Revised Civil Code, dealing with predial servitudes or

servitudes of land (found in Book II, that treats of things and the different modifications of ownership), under which title Article 803 is to be found.

In the first place, it is impossible to apply Article 803 by analogy or otherwise to a mineral servitude without dividing the servitude and without doing violence to innumerable other articles of the code to be found under this same title. To illustrate, when this article is properly applied to the cases intended, the party who loses his right of servitude by nonuse does not interfere with or have any effect whatsoever upon the right of those owners who have preserved the servitude to use the servitude in its entirety, i. e., the whole area affected by the primitive grant. As the article is here applied by analogy, the person who has preserved the servitude by using it within the ten year prescriptive period is forever barred from using this servitude to the extent that it affects the area released by prescription as against another owner who has failed to use it.

A study and analysis of all of the cases wherein this court has been called upon to determine and adjudicate with respect to the nature of the ownership and the rights acquired in the reservation, purchase, and sale of minerals, shows that from the very first the court concluded such ownership is not of the minerals themselves but only of a right to go upon the land and explore for and reduce to possession whatever minerals may be found underlying the designated area. Such a right was classified as a real right in the nature of a servitude in favor of a person, or, as otherwise expressed by Chief Justice O'Niell in his original decision in the Frost-Johnson case (150 La. 756, 91 So. 207, 216) as "a real right, or servitude of the sort called usufruct." What the court has actually done by its jurisprudence in this resepct is to establish a type of servitude that is neither predial nor personal, strictly speaking. It is clearly not a personal servitude because it does not expire with the death of the owner. And it is not a predial servitude, for it is not established upon one estate for the benefit of another estate. It cannot, therefore, be governed by the letter of any of the articles of the code that deal with either personal or predial servitudes. Instead, being sui generis, the court has, in the past, applied only such articles found under each of these categories as are capable of being applied to the so-called mineral servitude by reason of its nature and concept and it has refused to apply such of the articles as have been found to be either against public policy or detrimental to private rights. The court has consistently refused to classify the servitude as a predial one or to apply any of the articles found under the title dealing with predial servitudes to the so-called mineral servitude unless the article sought to be applied was found to be of such a character as to be applicable generally to all servitudes. Gulf Refining Co. v. Hayne, 138 La. 555, 70 So.

509, L.R.A.1916D, 1147, Ann.Cas.1917D, 130; Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207; Lee v. Giauque, 154 La. 491, 97 So. 669; Wemple v. Nabors Oil & Gas Co., 154 La. 483, 97 So. 666; Wilkins v. Nelson, 155 La. 807, 99 So. 607; Clark v. Tensas Delta Land Co., 172 La. 913, 136 So. 1; Palmer Corporation of Louisiana v. Moore, 171 La. 774, 132 So. 229; Sample v. Isaac Whitaker, 171 La. 949, 132 So. 511; Sample v. York Whitaker, 172 La. 722, 135 So. 38; Patton v. Frost Lumber Industries, 176 La. 916, 147 So. 33; Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; Ford v. Williams, 189 La. 229, 179 So. 298; Ohio Oil Co. v. Cox, 196 La. 193, 194, 198 So. 902; and Frost Lumber Industries v. Republic Production Co., 5 Cir., 112 F.2d 462; as well as an excellent treatise on the entire subject of the so-called mineral servitude to be found in Dr. Harriet Spiller Daggett's work on Mineral Rights in Louisiana.

Under this jurisprudence the extinguishment of a so-called mineral servitude for its nonuse for ten years is governed by the public policy of the state touching on all servitudes generally as expresed in Article 789 of the Revised Civil Code (found, true, under Title IV) but when read in connection with Article 3546, which declares that "The rights of usufruct, use and habitation and servitudes are lost by nonuse for ten years."

Likewise, under this jurisprudence, the application of the provisions of Article 802, suspending prescription in favor of majors when the servitude is held jointly with minors, is not based upon the fact that a mineral servitude is in fact a predial servitude or is classified as one, but, rather, upon the conclusion of the court that the provisions of Article 802 are declaratory of a general principle which may be applied to a personal as well as to a predial servitude. See, Palmer Corporation of Louisiana v. Moore, 171 La. 774, 132 So. 229, and Sample v. York Whitaker, 172 La. 722, 135 So. 38.

In the Palmer case Chief Justice O'Niell, the author of the main opinion on original hearing, had this to say in treating of articles 801, 802, and 803 [171 La. 774, 132 So. 231]: "The language of the articles quoted shows plainly that articles 801 and 802 and the first paragraph of article 803 are applicable only to real or predial servitudes, and not to a servitude in favor of a person. The second paragraph of article 803 seems applicable to a personal servitude, if the servitude be in favor of two or more persons and the right of each one of them is so defined that it may be exercised without interference with the right of another. Real or predial servitudes are defined in article 646 of the Code, thus: 'Real servitudes, which are also called predial or landed servitudes, are those which the owner of an estate enjoys on a neighboring estate for the benefit of his own estate.' Article 801 says: 'If the estate in whose favor the servitude is established,' etc.,

which cannot refer to anything but a predial servitude. And article 802 says: 'If among the coproprietors,' etc., which means the coproprietors of 'the estate in whose favor the servitude is established.' And the first paragraph of article 803 says: 'When the estate to which the servitude is due,' etc., which means only a predial servitude. Ever since the ruling in Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207, *we have adhered to the view that the right of a person to the mineral oil and gas in the land of another is a personal servitude, in the nature of a limited usufruct.*" He therefore concluded that these articles have no application to a mineral servitude. On rehearing, however, the court, in a per curiam, declared that the above statement in so far as it relates to articles 801, 802, and 803, "is not to be regarded as authority," remarking that while it had been argued with much force in the application for a rehearing that these articles are declaratory of a general principle only, which may be applied to personal as well as to predial servitudes, the court would express no opinion in that respect. This decision was handed down on original hearing in December, 1930, and on rehearing on January 5, 1931. (Italics are mine.)

In April following the decision on rehearing in the Palmer case, the court, in the case of Sample v. York Whitaker, 172 La. 722, 135 So. 38, 40, squarely held that the provisions of Article 802 *"are merely declaratory of a general principle* to the effect that, as to an indivisible real right or servitude, where the prescription applicable to it is suspended as to one of several joint owners of the right, it is suspended as to all of them, and this necessarily so, because an indivisible right or obligation cannot be extinguished in part and exist in part." In this opinion, and in accord with the jurisprudence of this state on the subject, we find the following pertinent observation:

"*Mineral reservations * * * are deemed servitudes in favor of the person, in the nature of a limited usufruct. * * * They are real rights in favor of the person instead of an estate. * * ** The real estate to which such servitudes attach is released from the servitudes by their nonuse for a given period, as provided by articles 789 and 3546 of the Civil Code. These articles are usually cited as pertinent to such reservations * * *.

\*      \*      \*      \*      \*      \*

"Prescription does not run against minors, but is suspended, as to them, during their minority, save in those instances specifically provided by law. * * * Hence the running of that prescription is suspended as to minors, so long as their minority continues.

\*      \*      \*      \*      \*      \*

"Article 802 of the Civil Code reads that: 'If among the coproprietors there be one against whom prescription can not run, as for instance a minor, he shall preserve the

right of all the others.' *This article is the logical sequence of the principle that the rights of servitude are indivisible,* a principle which was for the first time incorporated in the Code of 1825 as article 652, and repeated in the Revised Civ.Code of 1870, as article 656, although, as provided by article 657 of the Revised Civ.Code of 1870, which is article 653 of the Code of 1825, the advantages resulting from the servitude may be divided, whenever they are susceptible of division.

"*While this court has defined,* as we have said, *a mineral reservation * * * to be a servitude in favor of the person, in the nature of a limited usufruct,* it has never defined it to be a usufruct, which is declared by article 538 of the Civil Code to be divisible. We think that *it is indivisible in its nature,* although the advantages that may be derived from it are divisible. *It must stand or fall as a whole.*" (Italics are all mine.)

With all due respect to the main opinion and the views therein expressed, it is my humble opinion that the observation made therein that this court reached the right result in the case of Hodges v. Norton, 200 La. 614, 8 So.2d 618, but applied the wrong principle of law (for the reason that the widow and heirs of the primitive owner of the so-called mineral servitude owned a fractional interest in the servitude throughout the entire tract in common with all of the other owners of the servitude, clearly showing a coproprietorship thereof,

as contemplated by Article 801 of the code) shows that the author thereof has misinterpreted the issues in the Hodges case. The theory of coproprietorship was never at issue in that case. The sole issue was whether a *new* servitude had been established by the various transactions shown to have occurred in the factual set-up of the case and whether this *new* servitude had prescribed by its nonuse during the ten year prescriptive period although there was development and production on another portion of the tract of land affected by the original or primitive servitude.

I think the facts in the Hodges case may be fairly stated to be as follows:

Esmond Hodges and his wife sold a tract of 440 acres to A. J. Hodges on November 6, 1915, reserving unto themselves an undivided half interest in the oil, gas, and other minerals thereunder for a restricted period of 15 years. Thereafter Hodges died and Mrs. Hodges and his heirs sold an undivided ¼ interest in the minerals in the entire acreage to J. A. Selby, Jr., on October 29, 1923. This was an undivided half of their reserved and undivided half interest in the minerals; but no mention was made in the Sale to Selby of the 15-year restrictive period. Two days later, on October 31, 1923, Selby sold the interest thus acquired by him from Mrs. Hodges and her children to R. W. Norton, but the interest sold by him to Norton did not cover the entire 440-acre tract. It covered only two non-contiguous

tracts that formed a part of the original 440 acres—one tract containing 80 acres and the other 140 acres. Selby retained the mineral interest that had been acquired by him in so far as it affected the remaining 220 acres. In his sale to Norton, Selby also made no mention of the restrictive period of 15 years. On November 21, 1923, A. J. Hodges (to whom the land had been sold when the mineral rights were originally reserved) released Selby from the "reversionary" rights in so far as they affected the undivided ¼ interest Selby had purchased from Mrs. Hodges and her children and on the following day Selby reconveyed this release back to A. J. Hodges, limited, however, to the mineral rights sold Norton by Selby. Two wells were drilled in 1924 under lease given by Mrs. Hodges, her children, and A. J. Hodges prior to the sale of the undivided ¼ mineral interest to Selby. These wells were located on the land not affected by the interest Norton purchased from Selby. In other words, they were located on the 220 acres on which Selby had retained the mineral interest acquired by him, and not on the 80-acre tract or on the 140-acre tract affected by Norton's mineral interest. These wells continued to produce until 1931. The suit was instituted for the purpose of having declared extinguished for nonuse of 10 years the Norton mineral interest in the acreage affected by his purchase from Selby. It was the contention of the plaintiffs that Hodges, by his conveyance of the reversionary rights to Selby on November 21, 1923, and Selby's reconveyance of these rights back to Hodges on the following day—excepting from such conveyance the 220 acres affected by the mineral interest Norton had purchased from Selby, had intended to establish a *new* servitude in favor of Norton by reducing the same from the 15-year prescriptive period provided in the original mineral reservation when the land was sold to the 10-year prescriptive period provided for in Article 789 of the Revised Civil Code. In disposing of this issue the court said: "The land upon which the servitude was established is one continuous tract. There was but one indivisible servitude and the mere fact that the mineral owners conveyed undivided interests in the right to others did not have the effect of dividing it. * * * The reason for this is that a servitude can only be created by the owner of the land. Therefore, when the widow and children of E. W. Hodges conveyed an undivided one-fourth interest in the minerals to Selby, the servitude covering the entire land remained intact. Likewise, when Selby conveyed to Norton a one-fourth interest in the minerals in and under 220 acres of the tract, *the servitude was not divided and exercise of the servitude on any portion of the land preserved it as to the whole.*" (Italics are mine.)

· Clearly the court disposed of this issue in the light of the jurisprudence as it has up until now been generally understood not only by this court but also by the bench and bar throughout the state, and, I think, correctly so. The fact that Mrs. Hodges and her children retained a fractional interest in the entire servitude did not have the effect of interrupting the then running prescription, for this was never at issue. Instead, it was the fact that the *servitude was indivisible and that it had been exercised* by the drilling of a well on the area covered by the original or primitive servitude, although not on the part of the estate affected by the interest acquired by Norton, that had the effect of preserving the servitude as to the entire tract, which, naturally, made Norton's title to the mineral interest purchased by him good.

· Finally, I believe most apropos here the admonition the Chief Justice has posed on so many occasions to the effect that when the decisions of this court have established a rule of property, as has been done in the cited cases with respect to mineral rights, "they should not be reversed, even though a contrary rule might be deemed more logical, unless it be by an act of the Legislature." Roberson v. Pioneer Gas Co., 173 La. 313, 137 So. 46, 49, 82 A.L.R. 1264.

For these reasons I respectfully dissent from the views expressed and the result reached by the majority of the court.