McCALEB, Justice
(dissenting).
The main opinion flatly refuses to apply Article 792 of the Civil Code to mineral servitudes when there has been forced unitization, despite the fact that the codal article, by its plain terms, governs the case. In reaching this result it is declared that the decision in Boddie v. Drewett, 229 La. 1017, 87 So.2d 519 (1956) will not be followed because it “ * * * is inconsistent with the objectives, aims and policies of our conservation law”. To support this view, the majority quotes, as authority, the observations of the late John B. Hussey, former Commissioner of Conservation, reported in Institute on Mineral Law (5th Annual, 1957), Louisiana State University Press at page 161, to the effect that forced unitization is not a complete bar to drilling as found in the Boddie case, since the forced pooling orders merely constitute a cooperative effort for each owner of a drilling right, whereby the designated operator acts for them regardless of whether his exploration results in production or a dry hole. Adopting, substantially, the hypothesis of Mr. Hussey the instant opinion states that it has solved the problem in this case by applying "certain basic principles which we hold to be indisputable”.
I have searched in vain for the indisputable basic principles on which the opinion is said to be predicated and encounter difficulty in discovering that the views therein expressed are consonant with the codal provisions pertaining to predial servitudes and the .established jurisprudence which has applied those provisions in mineral cases. Of course, if the unitization provisions of the conservation law are exercised on tracts on which no servitudes or real rights exist, then, the idea of Mr. Hussey that the operator should act as agent for all of the landowners may not be objectionable as no legal disputes are presented in such circumstances. Many legal problems arise, however, when the rights of servitude owners are involved as those rights, by reason of the codal articles on prescription for *297 nonusage, are usually adverse to the rights of the landowner. In these instances, the postulations of Mr. Hussey settle nothing from a legal standpoint for, necessarily, the respective rights of the landowners and servitude owners, inter sese, have little to do with conservation measures and must be adjudged under applicable provisions of the general law — our Civil Code. Determination of these problems have no effect on the operation, aims and policies of the conservation law.
In the absence of a mineral code, it long ago became the lot of this Court to adjudge the nature of mineral rights, and the obligations and advantages flowing from contracts affecting such rights, within the framework of our • civil law. In performance of this task, the Court has consistently held that the sale or reservation of minerals creates a real right in the nature of a servitude and during the years has developed and extended the doctrine, by analogy, to those provisions of the Civil Code which relate to real or predial servitudes. In the development of the jurisprudence, the Court has also refused to attribute to this real right in- the nature of a servitude characteristics which are essentially those of personal servitudes. See Ohio Oil Co. v. Ferguson, 213 La. 183, 34 So.2d 746 (1947) and other authorities.
The opinion in Boddie v. Drewett simply applied the articles of the Civil Code in resolving that there was actually and factually an obstacle (a lawful order of unitization of the Conservation Commissioner) which effectively prevented the servitude owner from using the servitude and, hence, suspended the running of prescription under the provisions of Article 792 of the Code for the period during which the order was in forcé. And it was also held, in keeping with the prior jurisprudence on the subject, that there was not a user of the servitude on the 12 acres, forming part of the forced unit there involved, because the dry hold was not drilled on the land covered by the servitude, it being essential under Article 789 that there be good faith drilling on the servitude tract in order to interrupt the running of prescription.
The concept adopted in the main opinion is that, whenever the Conservation Department enters an order unitizing lands, all tracts within the unit on which servitudes or mineral rights exist are relegated to a new status. The drilling operator selected by the Conservation Commissioner becomes, ipso facto, the agent for all mineral owners and the contractual and other legal rights existing between them and the surface owners under our codal law are abrogated except that, if good faith drilling occurs and a dry hole results, the running of prescription as to all mineral rights in lands comprising the unit is interrupted whether or not the particular tract burdened with & real right is located within the drilling area.-
*299 It is professed that this view coincides with the public purpose of conserving the natural resources of the State. I find it hard to see how this is so — for the objects, purposes and aims of the conservation laws are not affected in any manner by affording plaintiffs their legal rights under our codal law. Indeed, the only beneficiary of this decision is the landowner, who is given the mineral rights on the land involved prior to the time the mineral owners had lost those rights by nonuser in accordance with the articles of the Civil Code.
It is also stated that denial of the existence of an obstacle resulting from forced unitization is consonant with public policy which does not favor “unwarranted extensions of liberative prescription on mineral servitudes.” But why should the existence of a legal obstacle be characterized as “unwarranted”? Our Code provides that obstacles suspend prescription and the jurisprudence has applied this provision to mineral servitudes.
In addition, the opinion rejects application of Article 792 of the Civil Code in cases like this for reasons which to me appear tenuous. The article provides for the suspension of prescription of predial servitudes when the servitude owner is prevented from using it “by any obstacle which he can neither prevent nor remove”. The rationale of the majority ruling appears to be that the servitude owner, being cognizant of the conservation laws at the time of his acquisition, tacitly consents to the imposition of the obstacle preventing the servitude’s use and, since the appointed operator is the forced legal agent of each owner of a drilling right for the development of the unit, the obstacle is really no obstacle at all. But this cannot be so — for, by denial of the right of use, the servitude owner is being stripped of his contractual rights by the Court.
In truth, the majority statement that, inasmuch as the conservation order constitutes the appointed operator as the forced agent for all there is really no obstacle to use “ * * * for it does not prevent the use of their servitude, it merely controls the method of user”, reveals the fundamental flaw in the theory, which is actually destructive of the servitude owner’s contractual rights and the legal real rights flowing therefrom. For, if the law is construed to require (which it does not) the servitude owner to accept the unit operator as his agent, the result is bound to be that the mineral owner loses his legal right of user while the unit is in existence since he can neither drill himself nor can he require the operator to drill on the unit within any specified time so that the running of prescription will be interrupted, as deduced by the majority view. Thus, the mineral owner is helpless and to say that the unitization order does not impose an obstacle to his user is pure sophistry. I really concede, of course, that when the unit operator drills *301 a well he acts for the benefit of all concerned since all share proportionately in production. But to deduce that the operator is the tacitly appointed drilling agent of the mineral owners is obviously erroneous because those owners are not vested with any right of supervision or control over such alleged agent, particularly insofar as the time (which may be vital to the mineral owner) he will select as proper to conduct good faith operations.
Nor can I subscribe to the view of the Court of Appeal (see 177 So.2d at page 804) that this case is distinguishable from Boddie v. Drewett because, here, drilling was permissible on part of the servitude area at all times — that is, that three of the 45 unitized servitude acres were not subject to the non-drilling Order 307 and 7}^ of the 6iy¿ acres unitized under superseding Order 307-b were not within the non-drilling area.
This deduction is founded on a faulty premise. The unitization orders restricted the drilling operations to one well, which only the operator designated by the Commissioner was authorized to drill. The provisions of the original order, that any well drilled on the units must be at least 1,320 feet from the nearest unit line, and of the supplemental order, that drilling must be at least 1,000 feet from the unit boundary, cannot be regarded as giving plaintiffs the right to drill on any portion of their servitude lying within the unitized area. On the contrary, it was only the operator who was permitted to drill on the unit and the conservation orders that a well must be 1,320 feet or 1,000 feet from the unit boundaries had reference solely to the area designated by the Commissioner, i.e., the area found by the Commissioner from which the minerals could be economically and efficiently extracted from under the lands comprising the unit by a single well.
The orders of the Commissioner were effective obstacles to plaintiffs’ user of the servitude and there is no preceptible difference in law or in fact between this case and Boddie v. Drewett.
I respectfully dissent.